EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE EASTERN DISTRICT OF MARYLAND

3                        CIVIL ACTION

4

5      - - - - - - - - - - - - - - - - - - - - - - - -

       RAYMOND GRAY, et al.,       :1:13-cv-02270-WMN
6                                  :
               Plaintiffs,         :
7           vs.                    :
                                   :
8      OFFICER WILLIAM SCOTT KERN, :
       et al.,                     :
9              Defendants.         :
       - - - - - - - - - - - - - - - - - - - - - - - -

10

11

12

13              Transcript of deposition of OFFICER EFREN E.

14     EDWARDS, SENIOR taken by and before Mary McKeon,

15     Registered Professional Reporter, Notary Public, at the

16     Rabineau Law Offices, Suite 2252, World Trade Center,

17     401 East Pratt Street, Baltimore, Maryland on Friday,

18     January 16, 2015, commencing at 10:51 a.m.

19

20

21

Deposition of Ofr. Efren Edwards

Raymond Gray, et al v. Officer William Scott Kern, et al

---

Page 2

1  APPEARANCES:

3

4  RABINEAU LAW OFFICES
5  BY:  ALLAN B. RABINEAU, ESQUIRE
   Suite 2252
6  World Trade Center
   401 East Pratt Street
7  Baltimore, Maryland 21202

8  and

9  A. DWIGHT PETTIT, P.A. LAW OFFICES
   BY:  A. DWIGHT PETTIT, ESQUIRE
10  3606 Liberty Heights Avenue
    Baltimore, Maryland 21215
11  -- co-counsel for the plaintiffs

14  SCHLACHMAN, BELSKY AND WEINER, P.A.
15  BY:  CHAZ R. BALL, ESQUIRE
    Suite 1100
16  300 East Lombard Street
    Baltimore, Maryland 21202
17  -- for the defendant Officer William Scott
    Kern

---

Page 3

1  APPEARANCES (Continued):

5  PAUL M. MAYHEW, ESQUIRE
6  Assistant County Attorney
   Baltimore County Office of Law
7  Room 219
   400 Washington Avenue
8  Towson, Maryland 21204
   -- for the defendant Baltimore County

11  WHITEFORD TAYLOR PRESTON
    BY:  THURMAN W. ZOLLICOFFER, JUNIOR, ESQUIRE
12  and PATRICK McKEVITT, ESQUIRE
    7 Saint Paul Street
13  Baltimore, Maryland 21202
    -- for the defendants Major Eric L. Russell,
14  Senior and Officer Efren E. Edwards, Senior

---

Page 4

# I N D E X

WITNESS                          PAGE

Officer Efren E. Edwards, Senior

by Mr. Rabineau          5
by Mr. Mayhew           69
by Mr. Ball             75
by Mr. Zollicoffer       86

# E X H I B I T S

(None.)

---

Page 5

# P R O C E E D I N G S

Whereupon,

EFREN EDWARDS, SENIOR,

having first been duly sworn, was examined and

testified as follows:

BY MR. RABINEAU:

Q   Would you, please, state your full name

and business address?

A   Efren Emerson Edwards, Senior, 601 East

Fayette Street, Baltimore, Maryland, 21204, Fifth

Floor; headquarters building.

Q   So, you're still employed by the Baltimore

City Police Department?

A   Yes, I am.

Q   And you are Officer Edwards?

A   Yes.

Q   And you have been on the force 28 years

now?

A   It will be 28 in June.

Q   And on February the 12th, 2013, were you

assigned as a tactical trainer at the Rosewood

---

Page 6

1  facility?

2  A   I was assigned to the education and

3  training division.  I was detailed to the Baltimore

4  City Police Commissioner's Executive Protection Unit.

5  **Q   But on February the 12th of 2013, you were**

6  **present at Rosewood?**

7  A   Yes.

8  **Q   And in what capacity were you present?**

9  A   As an instructor.

10  **Q   An instructor in what?**

11  A   Tactical training.

12  **Q   Did that entail, on your behalf, bunker**

13  **training?**

14  A   No.

15  **Q   Officer Kern was doing the bunker**

16  **training?**

17  A   Yes, sir.

18  **Q   And what specific type of training were**

19  **you doing?**

20  A   I was doing room clearing and hallway

21  observation.

Page 7

1  **Q   Well, room clearing is pretty apparent.**

2  **But what is hallway observation, what does that**

3  **entail?**

4  A   Any event you have a suspect or an

5  assailant who may attempt to barricade himself in a

6  room or you are, as a police officer, part of a

7  tactical entry team, we teach the officers to

8  traverse down a hallway, keeping their eyes forward

9  with their muzzles in a safe capacity, not to laser

10  their partners if you're not the point man,

11  particularly if you have a suspect who is known to be

12  armed and you are in search mode.

13  Now, to be totally honest with you, that's

14  not scratching the surface as to what we teach them,

15  because I would be here all day trying to explain it.

16  **Q   Well, you've answered my question to my**

17  **satisfaction.**

18  A   Okay.

19  **Q   Someone else may want to explore it, but**

20  **it's okay.**

21  How long had you been involved in that type

Page 8

1  **of training?**

2  A   I was a member of the SWAT unit for eleven

3  years prior to being transferred or requesting a

4  transfer to go to the education and training

5  division.  I was with education and training for

6  almost nine years, almost ten years before the actual

7  incident date.

8  **Q   Do you have to get, as a trainer,**

9  **recertified or retrained on a periodic basis?**

10  A   As far as keeping your certifications up?

11  **Q   Yes.**

12  A   Yes.

13  **Q   Is that a yearly basis or --**

14  A   It depends on the actual training.  Some

15  of the training, you keep your certifications for

16  three years.  Some certifications, like your MPTC

17  certification, you have to get that done yearly.

18  Firearms instructor can go up to five years

19  without recertification.  EVOC training is -- can go

20  seven, eight years before they ask you to recertify.

21  MPTC basic instructor, as far as classroom

Page 9

1  instruction, you can hold onto that till almost three

2  years.

3  This is the last time I was in educational

4  training.  They change from year to year.  Sometimes

5  they stay the same and sometimes they change.

6  **Q   I have a question as a result of what you**

7  **just said.  Are you still in training as a trainer?**

8  A   No, sir.  I was involuntarily transferred

9  to the community partnership division.

10  **Q   You say involuntarily?**

11  A   Yes, sir.

12  **Q   That was, I take it, against your wishes?**

13  A   Yes, sir.

14  **Q   Did you want to remain in training?**

15  A   Yes, I did.

16  **Q   Why were you transferred, if you know?**

17  A   I believe the stance that the Baltimore

18  City Department took because of the nature of the

19  incident and because of the sensitivity in which they

20  stood, they removed the parties that they believe to

21  be involved in the incident, to investigate.

Page 10

1    Q   With regard to your -- I'm going to call
2   it your lesson plan, what you were doing on that
3   February day with the class, I'm using the words,
4   "lesson plan."  Do you have a better term for that,
5   or can we use that term?
6        MR. ZOLLICOFFER:  Objection.
7        You can answer, if you understand what he's
8   asking.
9        THE WITNESS:  I understand exactly what
10  he's saying.  He's talking about the curriculum for
11  the actual training.
12  BY MR. RABINEAU:
13   Q   Exactly.
14   A   The lesson plan is implemented at
15  education and training, and it's actually a class
16  that is taught through your actual training.
17       MPTC recognized the training; I forgot what
18  year.  It was implemented by Lieutenant Brian Pearson,
19  and I can't remember the exact date that he implemented
20  the training, but that's when it was recognized to be
21  given.  I believe it's given -- I could be incorrect,

Page 11

1   but I believe it's called a P number to certify the
2   actual training.
3    Q   Is that part of a manual?
4    A   Part of a manual?
5    Q   Yes.  When you say a P number, it's a
6   series of pages?
7    A   Yeah.
8        MR. ZOLLICOFFER:  Objection as to which
9   manual.  There are multiple manuals.
10       MR. RABINEAU:  I'm going to get into it.
11  BY MR. RABINEAU:
12   Q   So the designation as P, does that
13  indicate it's part of one manual as opposed to
14  another, or does that P just designate a page within
15  a manual?
16   A   I think it designates one manual to the
17  other.
18   Q   As far as what you were training that day,
19  was that lesson plan reduced to writing of some form?
20   A   Could you elaborate?
21   Q   Yes.  In other words, you were teaching

Page 12

1   part of a curriculum that day, which you've already
2   identified.
3        I'm asking you, did you have a written source
4   that you could refer to that indicated what you had to
5   train the trainees on that day?
6    A   We have -- not like an SOP, but we have in
7   the course schedule that the schedulers give out, we
8   have it.
9        We have to go to -- we have to attend --
10  because of the equipment that we use, we have to get a
11  certification to use the simunition equipment through
12  the training.
13       The simunition certifications come through
14  MPTC out in Sykesville.  And you have to go through the
15  instructor's course, it's like a week's course, before
16  you can actually teach the class.
17   Q   Are there any written materials that are
18  handed out as part of that training?
19   A   There's a simunitions manual, yes.
20   Q   Now, in your training, you were using
21  simunitions, correct?

Page 13

1    A   Yes, sir.
2    Q   Were you familiar with the training
3   that -- in the afternoon of the 12th, the training
4   that Officer Kern was undertaking?
5    A   Yes.
6    Q   And would you refer to that as bunker
7   training?
8    A   Yes, sir.
9    Q   Was he using simunitions?
10   A   Yes, sir.
11   Q   Had you ever trained trainees in bunker
12  training?
13   A   Yes, sir, I actually trained trainees.  I
14  also trained SWAT officers in bunker training.
15   Q   So, you were very familiar with the rules
16  and regulations regarding bunker training?
17   A   Yes, sir.
18   Q   Now, were there any rules or regulations
19  with regard to having a live weapon in the area where
20  the simunitions training was going on, such as in the
21  bunker training?

Deposition of Ofr. Efren Edwards                    Raymond Gray, et al v. Officer William Scott Kern, et al

Page 14

MR. ZOLLICOFFER: Objection. Are you asking for his training or for --

MR. RABINEAU: I'm asking, are there rules and regulations?

MR. ZOLLICOFFER: For any of the training?

MR. RABINEAU: Bunker training.

MR. ZOLLICOFFER: With simunitions?

MR. RABINEAU: When you're using simunitions in bunker training, are there any rules and regulations which pertain to having a live weapon in the training area? That's the question.

THE WITNESS: As far as the simunitions rules and regulations state, yes. And the SOP that we have in the Baltimore City Police Department SWAT mandated that any bunker training using any simunition, you are not allowed to have live weapons in that training area.

BY MR. RABINEAU:

Q   Obviously on the date -- that afternoon of February 12th, Officer Kern did have a live weapon?

A   Yes, sir.

Page 15

Q   He admitted that to you, didn't he?

A   Yes, sir.

Q   That was against the rules and regulations?

A   Yes, it was.

Q   Are you aware that he has indicated in testimony that you and he had agreed that he would have the live weapon on Monday and Tuesday and you would have it on Thursday and Friday?

A   I'm well aware of that.

Q   Do you dispute that?

A   Yes, I do.

Q   That conversation never took place?

A   Never did.

Q   Also, there's some question about the term, "officer in charge." And I just received your Answers to Interrogatories. And you indicate -- I think your words were you were not and could not be the officer in charge. Am I quoting you correctly?

A   Yes, sir. I have documentation to prove that it was not possible for me to be in charge.

Page 16

Q   Well, my question is, would you explain what you meant and the basis of your statement?

A   By the rules and regulations of the department in our general orders manual, if there is a sworn supervisor with supervisor capabilities, actual stripes or lieutenant or captain above working that day, it is impossible for an officer to be OIC.

Now, the rules also state in the absence of a sworn supervisor, that the advisor of the class is to assume the OIC position.

Officer Kern at the time of the shooting was an advisor for the class. I was not. I was detailed out on to the Commissioner's Executive Protection Unit and then detailed back for the training.

My sergeant was working, my detail sergeant was working and Officer Kern's sergeant was actually working. There is no way they would make me an OIC with three supervisors, three actual sworn supervisors working and Officer Kern being advisor of the class.

Q   Those three officers --

A   Three supervisors.

Page 17

Q   Three supervisors you just referred to, they were not on site, though, were they?

A   No, sir, they were not.

Q   You were the senior officer?

A   I was the senior officer, yes.

Q   I want you to educate me on this. Being the senior officer, did that give you any priority over Officer Kern?

A   No, it does not.

Q   Because, you say, he was the class advisor?

A   Advisor.

Q   Did you and he have any conversation regarding the fact who would be in charge?

A   No. We kind of -- we've been doing this for almost ten years up until the incident. And if there's not a supervisor on the scene, we kind of work hand-in-hand, together.

Q   If you had known that he had a live weapon in that training class that afternoon, what, if any, action would you have taken?

Page 18

1    A   I would have asked him to take it off.
2  Had he chose not to take it off, I would have
3  suspended the training. I would have went back to
4  the education and training division with the trainees
5  and I would have forwarded my administrative report
6  to my immediate supervisor.
7    Q   When were you first aware of the fact that
8  Officer Kern had a live weapon?
9    A   Officer Kern responded to me after the
10 incident and advised me that he discharged his
11 weapon, striking a trainee.
12   Q   Where you were positioned, could you hear
13 when that weapon went off?
14   A   No, sir, I could not.
15   Q   And, by the way, you've referred to a
16 simunition weapon. Can you identify it by
17 manufacturer or model number?
18   A   The actual model itself?
19   Q   Yes.
20   A   No, I couldn't. I can describe it for
21 you, but I can't exactly show you. But I haven't had

Page 19

1  a chance to go over it.
2    Q   Well, I'm going to show you what's
3  previously been introduced as, I think, Major
4  Russell's Exhibit Number 2.
5    A   Uh-hum.
6    Q   Is that a fair and accurate
7  representation?
8    A   Of a simunition weapon, yes, sir.
9    Q   Is it a Glock?
10   A   Yes, sir.
11   Q   Does the term T .22 mean anything to you?
12   A   That sounds like the description of the
13 weapon itself, yes.
14   Q   The live weapon that's issued to you by
15 the Baltimore City Police Department, that is a
16 Glock?
17   A   Yes, sir.
18   Q   A Glock .22?
19   A   Yes, sir.
20   Q   I'm just speculating: "T" might mean
21 training .22?

Page 20

1    A   I'm not exactly sure what the "T" actually
2  stands for.
3    Q   But the weapons, in appearance, other than
4  the blue color, are they similar?
5    A   Yes, sir.
6    Q   Now, what about the weight, is there any
7  difference in weight?
8    A   It would take someone who is experienced
9  in firearms to tell the difference in weight.
10        Yeah, there is a difference in weight,
11 because once this simunition weapon is fully loaded
12 with simunition rounds, the weight is actually
13 different.
14        A simunition round -- and I can't give you
15 the exact weight of the projectile itself -- but it
16 does not weigh the same as an actual round that's
17 loaded into an actual service weapon.
18        So if you were to load this simunition
19 weapon, fully loaded with simunition rounds and you
20 were to load and actual service weapon with firearms
21 rounds, your actual street rounds, there is going to be

Page 21

1  a weight difference.
2    Q   If you were blindfolded and you had the
3  Glock .22 and then you were given the Glock T .22, by
4  the feel of that, could you tell any difference, if
5  you were blindfolded?
6    A   Yes, I could.
7        MR. ZOLLICOFFER: Objection as to
8  vagueness.
9  BY MR. RABINEAU:
10   Q   You may answer.
11   A   Yes, I could, because like I stated
12 before, the simunition round does not weigh as much
13 as an actual --
14   Q   Forget about -- I hate to interrupt you,
15 but I wanted to save you from -- now, I'm not talking
16 about the weight. I'm just talking about the feel,
17 the handle, the trigger. I'm talking about the feel
18 of the two weapons.
19   A   Just the actual outer feeling?
20   Q   Forget about the weight. Just the
21 feeling, would it feel the same to you, blindfolded?

Page 22

1   A   Yes, it would feel the same.

2   Q   You've already seemed to indicate you

3  could tell the difference in weight.  Can you explain

4  which would be heavier?

5   A   Your actual service weapon would be

6  heavier if it was fully load with service ammunition.

7       If the Glock simunition weapon was actually

8  loaded with simunition rounds, it would be lighter than

9  an actual service weapon.

10   Q   I'm going to ask you a couple of questions

11  about a safety officer.  Are you familiar with the

12  term, "safety officer?"

13   A   Yes.

14   Q   In the training you were doing that Monday

15  and Tuesday, under your understanding of the rules

16  and regulations, was it necessary to have a safety

17  officer present?

18   A   Actually, one of us could assume the

19  position of a safety officer.

20   Q   Does a safety officer have to be armed

21  with a live weapon?

Page 23

1   A   No, sir.

2   Q   Well, let me ask you this: on that date,

3  was one of you acting as a safety officer?

4   A   I would think that we were both acting as

5  safety officers.

6   Q   Why was that?

7   A   Because -- to preserve the safety of

8  anyone who was participating in the training.

9   Q   What did you do in that regard on the

10  afternoon of February the 12th?

11       MR. ZOLLICOFFER:  Objection; vague.

12  BY MR. RABINEAU:

13   Q   You may answer.

14   A   Would you like me to go through all the

15  procedures that I took, precautionary measures I

16  took?

17   Q   What you think is relevant, yes.

18   A   Any training that we are using simunition

19  weapons, I was taught years ago, and it's also in our

20  SOP and also in the simunitions manuscript, that when

21  using simunition rounds, you should not or you will

Page 24

1  not have any live ammunition within the training

2  corridor.

3       What I did was I initially unloaded my

4  weapon.  I put the rounds in the magazine into the

5  glove box.  I locked the weapon bag -- assured that it

6  was empty, I put it in my safety lock black bag.  I

7  then put my safety lock bag in my trunk.

8       Then I asked Officer Kern while I was

9  searching the building to do a safety check.  As I was

10  doing a safety check inside the building, I assumed --

11       MR. ZOLLICOFFER:  You have to slow down.  The

12  court reporter is trying mightily to keep up.

13       THE WITNESS:  I assumed Officer Kern

14  understood my instructions and my request that he was

15  to do a weapons check.

16       We've done this, like I said, over the last

17  ten years of this training.  Officer Kern in the past,

18  to my knowledge, has never had a weapon on him during

19  this training.

20       I've done this training with SWAT officers,

21  sworn officers, trainees and outside agencies and I've

Page 25

1  never had an incident where an officer has participated

2  in the simunition training with his weapon on him.

3       I advised Officer Kern or I asked Officer

4  Kern after I searched the building, did he do a weapons

5  check; I said this in front of 16 to 17 trainees.

6  Officer Kern replied by shaking his head and answering,

7  "Yes, I did a weapons check."

8  BY MR. RABINEAU:

9   Q   Have you finished your answer?

10   A   Not exactly.

11   Q   Well, I don't want to interrupt you.  But

12  I'm not asking you to say anything more.  If you're

13  finished --

14   A   I'm not finished.

15   Q   Go ahead.

16   A   So as we continued the training, we broke

17  for lunch.  And once we came back at the second half

18  of the day -- I'm sorry; before we went to lunch, I

19  advised Officer Kern that I had to go to the bank to

20  make a withdrawal because I was going on vacation in

21  a couple of weeks.

Page 26

1    So, I advised Officer Kern if he was going to
2 allow any of the trainees to leave the Rosewood
3 reservation, to ensure that he did a weapons check when
4 they came back and not to enter the building until I
5 came back from the bank.
6    After I came back from the bank after the
7 trainees' lunch period, I got there, and Officer Kern
8 was already in the building. Once again, I took my
9 weapon off, I took the magazine out of my gun. I took
10 the round that was in the chamber off and topped off my
11 magazine. Put the magazine into the glove box of my
12 vehicle. I took and locked my weapon to a safe
13 position. I put it in my safe lock bag. I put that in
14 the trunk of my vehicle and I locked my vehicle.
15    I went inside, and Officer Kern had already
16 commenced with his bunker portion training. I advised
17 Kern before he continued, I asked him did he do a
18 weapons check. Once again, standing in front of the
19 trainees, Officer Kern stated to me that he did do a
20 weapons check.
21    From there, I took my portion of the trainees

Page 27

1 to a different portion of the building and we conducted
2 a room clear.
3    Q    Have you concluded?
4    A    Yes.
5    Q    Now, you indicated that you specifically
6 asked Officer Kern whether he had done a weapons
7 check in front of the class?
8    A    Yes.
9    Q    When he responded, did any of the trainees
10 speak up and say anything?
11    A    No.
12    Q    Did Officer Kern at any time express to
13 you the view that he felt that Rosewood facility was
14 an unsafe place in which to conduct the training?
15    A    No.
16    Q    Did he ever at any time tell you that he
17 had contacted the academy to speak to someone there
18 about his feeling that someone should be there as a
19 safety officer in addition to the two of you?
20    A    No.
21    Q    Did you feel that this facility was a

Page 28

1 secure area?
2    A    Yes, I did.
3    Q    Was there a gatehouse before you entered
4 onto the premises?
5    A    There was -- what do they usually call it?
6 Not exactly a secure gate, but there was a --
7    Q    Checkpoint?
8    A    Like a checkpoint that you have to pass in
9 order to get to where we were training. There was
10 also a security officer, unarmed security officer on
11 the grounds.
12    Q    Had you, before those two days, the 11th
13 and 12th, ever conducted any training at the Rosewood
14 facility?
15    A    No.
16    Q    Can you tell me, explain how it came about
17 that there was training on those two days?
18    A    Angela Choi, who is our class scheduler
19 for the academy, while I was detailed with the
20 Commissioner's Executive Protection Unit, she
21 contacted me and advised me that the class was to

Page 29

1 have the tactical training on this day, this day,
2 this day and this day.
3    I then contacted Officer Kern -- actually,
4 Officer Kern contacted me and said we can't train at
5 Dickman Street because the SWAT unit is training down
6 there and we cannot use the Camp Frederick location,
7 which is the military base in Sykesville -- I'm sorry
8 not, Sykesville.
9    Q    Frederick?
10    A    Frederick -- not Frederick. The one out
11 towards 795. What's the county out there?
12    MR. ZOLLICOFFER: Pikesville?
13    THE WITNESS: Close to Pikesville.
14    MR. ZOLLICOFFER: Owings Mills?
15    THE WITNESS: In that area. He said we
16 couldn't use that area because the military was using
17 it. It's a military base, so we couldn't use that
18 location.
19    So I said, "Well, let me call around and I'll
20 talk to some SWAT friends and see if we can borrow one
21 of their training sites." So I contacted a friend of

Deposition of Ofr. Efren Edwards                    Raymond Gray, et al v. Officer William Scott Kern, et al

Page 30

1  mine by the name of Jimmy Bossi, I told him our
2  dilemma. He said give him a couple of days, he would
3  call me back if he found a location.
4        He called me back a couple of days later. He
5  said, "I will give you a number to a Miss Rose Lambert.
6  She said that you guys could use the Rosewood
7  location."
8        I contacted Miss Lambert. She told me to
9  come out on a certain date to observe the Rosewood area
10  to see if it was conducive to our training. I
11  contacted Kern and advised him I was going to go out
12  and take a look at this location to see if it was
13  conducive for the training.
14        I also contacted my detailed supervisor, who
15  is Sergeant Scott Snead, and advised him that we were
16  going to be out at this location -- I was going to be
17  out at this location, observing if it was conducive for
18  our training.
19        I went out to Rosewood. She gave me the key,
20  Miss Rose Lambert. She gave me the key. She
21  introduced me to the security officer by the name of --

Page 31

1  I can't remember his last name, but his first name was
2  Keyon. And she told me to take a look at the buildings
3  and see if they were conducive for our training.
4        So, Mr. Keyon showed me -- gave me a tour of
5  the locations where the other agencies were training.
6  And he said that if you wanted -- what date you want to
7  use it, just give me a call and he would let Miss
8  Lambert know, use it this day, this day, this day, this
9  day.
10        So I went out, observed some of the
11  locations. I was okay with a couple of buildings we
12  were using for the training. I gave Mr. Keyon the key
13  back. I called Miss Lambert back, thanked her for
14  allowing us to use the facility for training.
15        I called Scott Kern and I said, "Scott, this
16  is the location that we're going to use for our
17  tactical training." I said, "Do you want to come out,
18  take a look at it?" He said he couldn't because he was
19  training with Sergeant Jackson out in Sykesville, doing
20  EVOC training.
21        I then called Angela Choi, who is the

Page 32

1  scheduler, and I told her where we were going to be
2  doing our training. Angela Choi said she would contact
3  Officer Kern, Sergeant Jackson and the trainees and
4  advise them of where we were going to be doing our
5  training.
6        I then went back and told my supervisor,
7  Scott Snead, that this is where we were going to be
8  doing our training on this day, this day, this day,
9  this day.
10        I also told my police commissioner and I also
11  told my chief of staff, Judy Pal, this is where we were
12  going to be training this day, this day, this day and
13  this day.
14  BY MR. RABINEAU:
15        Q   Why was it necessary to tell the police
16  commissioner where the training would be?
17        A   Judy Pal, at the time, was the chief of
18  staff. She's no longer with the department. She was
19  adamant about us letting her know where we were at
20  all times.
21        She said because of the position that we

Page 33

1  held, it's high profile, if you're working but you're
2  not in with the police commissioner, it is imperative
3  that he knows where you are at all times. She was
4  adamant about that.
5        Judy Pal was also adamant about the fact that
6  we do multitasking; that is, showed that the police
7  commissioner's officers in the Executive Protection
8  Unit were not exempt from multitasking. She advised
9  me, "If you are not with the commissioner, but you are
10  working, I need to know where you are at all times."
11        Q   Tell me again what Judy's last name is.
12        A   It's P-A-L. At the time, she was chief of
13  staff.
14        Q   Does she have a rank?
15        A   Chief of staff.
16        Q   Was she --
17        A   Civilian.
18        Q   You said you told Judy Pal, but then you
19  said previously, you told the police commissioner.
20  How do you know that she told the police
21  commissioner?

Page 34

1    A    I told the police commissioner.  We were
2  actually sitting in the car.  On occasion -- we
3  always went out to lunch together and we always went
4  from meeting to meeting -- to meetings together.
5        Normally, it was me driving and the
6  Commissioner in the front passenger, Sergeant Snead
7  behind me and Judy Pal behind the police commissioner.
8        But this day, I specifically remember that
9  Sergeant Snead was driving, the police commissioner was
10  in the front passenger, Judy sitting behind the police
11  commissioner and I was sitting behind the driver.  And
12  I advised the police commissioner of the dates, times
13  and location where we were going to be training at
14  Rosewood.
15    Q    What was his response, if any?
16    A    He said, That's fine.  Ms. Pal said,
17  That's good work.  Continue to do what you're doing;
18  it shows that we're multitasking and it shows that
19  the police commissioner is doing a good job.  And
20  he's concerned about the training that goes on at
21  education and training.

Page 35

1    Q    Explain to me what you mean by,
2  "multitasking."
3    A    Meaning doing one to two jobs in two,
4  different locations; being assigned to one unit while
5  being detailed out to another unit.  Handling
6  multiple jobs of -- I don't know -- you know,
7  responsibilities.
8    Q    Were you detailed -- I think you said
9  this, but tell me again -- were you detailed to the
10  commissioner's security unit?
11    A    I was actually assigned to education and
12  training, but I was detailed to the Police
13  Commissioner's Executive Protection Unit.
14    Q    Did you have regular shifts that you were
15  on the detail, his security?
16    A    My shift consisted of whatever -- the day
17  before -- what the commissioner's schedule was,
18  that's when my schedule worked.  I worked my schedule
19  around the police commissioner.
20        If I was not to be with him, Ms. Pal needed a
21  heads-up as to where we were because one of the things

Page 36

1  she was not crazy about was us being paid overtime
2  because she said it did not look good that the unit was
3  constantly being paid overtime for the hours they were
4  working.  So instead of paying us overtime, she
5  adjusted our hours.
6    Q    Getting back to Rose Lambert, do you know
7  what her relation was with the Rosewood facility, if
8  any?
9    A    When I spoke to Officer Bossi, he told me
10  Miss Lambert was the manager of the facility that we
11  trained at.
12    Q    Do you know if, as a result of your
13  training on those two days at Rosewood, any documents
14  were generated, any agreements that had to be signed,
15  were you aware of any?
16    A    No.
17    Q    When you indicated you spoke to the
18  commissioner and told him what you were doing, did he
19  indicate that there would have to be any documents
20  signed?
21    A    No.

Page 37

1    Q    This class that you were teaching would
2  have a designation, wouldn't it, such as
3  13-something?
4    A    Yes, sir.  I'm not exactly sure the name
5  of it, but it would have a number to identify the
6  class, yes, sir.
7    Q    The beginning of it would be the year?
8    A    And then the number of the class.
9    Q    But you don't recall which this was?
10    A    No, sir.
11    Q    Are you aware of any training at the
12  Rosewood facility that ever occurred before February
13  11th and 12th?
14    A    Only what I viewed and what Officer Bossi
15  told me and what Miss Lambert told me and what the
16  security officer told me.
17    Q    What did they tell you?
18    A    Miss Lambert said we could use the
19  building because other law enforcement agencies did
20  the type of training I was looking to do.
21        Jimmy told me he was no longer a SWAT member,

Page 38

1  he was out on patrol as a corporal, but when he was
2  with the Baltimore County SWAT unit, they trained at
3  that location.
4      I have friends with the State Police,
5  Sergeant Keith Ronk and Sergeant Wes Fortune, they're
6  both SWAT officers on the State team; I talked to them,
7  and they said they did training out there.
8      I have a Howard County friend by the name of
9  Clark, he was a SWAT member in Howard County; they did
10 some training out there.
11     But the only actual viewing that I actually
12 saw them doing was the day we were out there, there was
13 another unit actually training. I believe it was the
14 Watershed police officers.
15     And I did see on one location -- when I spoke
16 to Jimmy months before, I saw the Baltimore County
17 officers out there -- I wasn't actually out there
18 training, but I spoke to Jimmy, and there were
19 Baltimore County officers out there training. And
20 there were Watershed police officers out there
21 training.

Page 39

1  Q   What I meant to ask you, were you aware of
2  Baltimore City Police ever training at Rosewood
3  before February of 2013?
4  A   No.
5  Q   Do you know if the Baltimore City Police
6  have ever trained at the Rosewood facility after this
7  incident?
8  A   No, I'm not aware of that. No.
9  Q   Do you know if there's any reason why --
10 well, first of all, you're saying you're not aware of
11 it.
12     Do you know for a fact that the Baltimore
13 City Police haven't trained there since this incident?
14 A   I'm unsure.
15     MR. ZOLLICOFFER: Objection.
16 BY MR. RABINEAU:
17 Q   Getting back to the discussion you
18 previously mentioned when Officer Kern first related
19 to you that he had shot somebody; I want to get back
20 to that point. Do you recall where that discussion
21 took place?

Page 40

1  A   If I could describe it, he was on the
2  lower level where the -- like the basketball
3  gymnasium area is.
4      I was two levels above, to the far end. I
5  believe it was on the east side or the west side of the
6  building. He was on the lower west side of the
7  building. I was on the upper east side of the
8  building, training.
9      And he came to me and we talked. He came
10 running up the steps yelling and screaming, "Efren, Ef,
11 Ef, Ef." I was unsure why he was screaming, yelling,
12 but I could tell there was something wrong by the pitch
13 of his voice.
14     He got upstairs and he was extremely upset,
15 sweating, he seemed to be distraught. I asked him what
16 was wrong. He said, "I shot somebody." Initially, I
17 thought he may have shot someone without them having
18 their safety simunition equipment on.
19     I then asked him, "Okay. Where is the person
20 you shot?" He said, "Downstairs." So on the way down
21 the steps, he said, "I shot him with my gun." So I

Page 41

1  stopped in mid -- and I asked him, "You mean you shot
2  him with your gun?" So he said, "Yes."
3      So, I run downstairs to see Officer Gray
4  laying on the floor, with an entry wound to what
5  appeared to be his forehead.
6  Q   Where was his body, at that point,
7  situated?
8  A   He was like -- if the gymnasium was here,
9  Officer Gray was laying just outside of the gymnasium
10 entrance.
11 Q   Did Officer Kern ever indicate to you that
12 he intended to fire a simunition and he mistakenly
13 fired a live weapon?
14 A   He never said that he intentionally did
15 it. He never said that to me. No, he never said
16 that.
17 Q   Did he ever indicate to you why he was
18 firing in the direction where Mr. Gray was?
19 A   At the time, no. I didn't understand or
20 was made mention as to why he did it until the actual
21 court date.

Page 42

1   The day of the incident, when I asked him,
2   Officer Kern refused to say anything to me. When I
3   asked him -- I specifically asked him -- forgive my
4   language, I don't mean to offend anyone -- I
5   specifically asked him on the way down the steps, you
6   know, "What the fuck were you doing with a gun in the
7   building?" He then replied, "That's not important
8   right now." I then asked him, "Where is your weapon"
9   on several occasions. He said, "I still have it" on
10  him.
11      In the state of being that he was in, my
12  concern was he may be having an out-of-body experience.
13  And, by rules and regulations, the weapon wasn't
14  supposed to be in the building in the first place.
15      So, I decided at that time to take the weapon
16  off Officer Kern. So, I asked him to give me the
17  weapon, several times, and he refused to give it to me.
18      Q   You've indicated that Officer Kern told
19  you he shot somebody?
20      A   Yes.
21      Q   You got down to the level where he was

Page 43

1   instructing his trainees and you saw an individual on
2   the floor who had been shot?
3       A   Yes.
4       Q   And did you conclude that was the
5   individual that he shot?
6       A   Yes.
7       Q   Now, in relation to where the actual
8   training was going on, where was -- can we agree that
9   the body there was Mr. Gray's?
10      A   Well, at the time, I didn't have a lot of
11  contact with the class, so I was unsure that it was
12  actually Mr. Gray, because I wasn't familiar with the
13  actual trainees themselves. I didn't know them
14  personally or as personally as I usually do because I
15  was detailed out. I was just detailed back for the
16  training.
17      Q   I understand. But can we agree now, based
18  on your current knowledge, that individual was Mr.
19  Gray?
20      A   Yes, sir.
21      Q   Now, where was Mr. Gray on the floor in

Page 44

1   relation to where the bunker training was occurring?
2       A   If, let's say, this building was the
3   bunker training room, the gymnasium, it would be a
4   lot bigger, but that doorway was the exit or that
5   window was the exit leading out into the hallway
6   where Mr. Gray's body was, Mr. Gray would probably be
7   laying where that table is outside.
8       Q   So, in other words, Mr. Gray was outside
9   of the area where the bunker training was actually
10  going on?
11      A   Yes, sir.
12      Q   And between Mr. Gray and where the
13  training was going on, there was a doorway?
14      A   Yes.
15      Q   And that doorway had a little glass panel
16  in it?
17      A   Yes.
18      Q   Was Mr. Gray clothed in any protective
19  type of gear for simunitions training?
20      A   I couldn't tell you, because I didn't see
21  when the incident took place. But I am -- I can

Page 45

1   assure you that he had -- I know for a fact he had
2   his protective vest on, because we don't allow them
3   in the building unless they have that on. In fact,
4   once the training --
5       MR. ZOLLICOFFER: You answered the
6   question.
7   BY MR. RABINEAU:
8       Q   So, you're saying that you know for a fact
9   that Mr. Gray had his vest on?
10      A   Yes.
11      Q   He was wounded in the head; is that
12  correct?
13      A   Yes.
14      Q   Do you know why a simunition weapon would
15  have been fired in the direction where Mr. Gray was
16  standing?
17      A   I would not have that answer.
18      Q   Would that have been part of the bunker
19  training?
20      A   Not firing -- I mean, I can't answer that
21  question, because I wasn't there.

Deposition of Ofr. Efren Edwards                    Raymond Gray, et al v. Officer William Scott Kern, et al

Page 46

1    Q   Did Officer Kern ever tell you why he
2  fired the weapon in that direction?
3    A   He never told me, personally.  I learned
4  about it at the court proceedings.
5    Q   You said you learned about it.  You were
6  in the courtroom?
7    A   Yes.
8    Q   And you heard him testify?
9    A   Yes.
10   Q   And what did he say regarding that?
11   A   He stated he fired in the direction -- and
12  this is just bits and pieces, I don't know the --
13  exactly what he said -- he said that he fired in the
14  direction of Officer Gray to somewhat teach him a
15  lesson; that's from peeking in the windows.
16   MR. ZOLLICOFFER:  That's your recollection
17  from --
18   THE WITNESS:  Yes.
19  BY MR. RABINEAU:
20   Q   That's not the exact -- I understand
21  that's your best recollection.

Page 47

1    A   Yes.
2    Q   Was that contrary to rules and regulations
3  of bunker training?
4    A   Yes, it is.
5    Q   In what way?
6    A   First of all, number one, we don't fire --
7  we don't fire simunition weapons, and definitely not
8  live weapons, in the direction of a trainee to teach
9  anyone any lessons.
10   And if you are to fire a simunitions weapon
11  in any direction of a trainee, it is in the process of
12  actual scenario-based training; meaning if Officer Kern
13  was playing the bad guy and Officer Gray and his entry
14  team or search team was searching the building for the
15  bad guy, they would be fully clothed in all of their
16  simunitions protective gear.
17   Q   And Mr. Gray was not fully clothed --
18   A   From what I understand.
19   Q   -- as you saw him on the ground?
20   A   He did not have his gear on, no, sir.
21   Q   In addition to the vest, what else would

Page 48

1  constitute the full gear?
2    A   Simunitions gear, you are advised to wear
3  a groin protecter, throat protecter, head protection
4  and gloves, on top of having your issued service
5  protective vest.
6    Q   As you saw Mr. Gray initially, do you
7  recall whether he had a cap on of some type?
8    A   No, sir.
9    Q   You and Officer Kern, as I understood it,
10  had divided up the class that afternoon?
11   A   Yes, sir.
12   Q   And you were training part of the class,
13  he was training the other part of the class?
14   A   Yes.
15   Q   And then there were some other individuals
16  that Mr. Gray was part of?
17   A   Yes, sir.
18   Q   Can you explain what -- well, they
19  obviously were, you said, on the other side of the
20  door --
21   A   Yes, sir.

Page 49

1    Q   -- Mr. Gray and some others?
2    A   Yes.
3    Q   Do you know how many others, in addition?
4    A   I can't remember the exact number because
5  I don't know the number of students that Officer Kern
6  was teaching at the time.
7    Ratio of student per instructor for any
8  instruction, individual instruction, is one trainer per
9  three students.
10   So, I'm guessing that Officer Kern was
11  probably teaching three trainees at a time because with
12  bunker training, you have a bunker guy, a cover guy
13  behind him and a hands person.  So, you have one, two,
14  three that follow in that order.
15   So, I'm pretty sure when he was giving his
16  bunker training, that's probably the procedure: he had
17  one guy as the bunker, one guy with the cover and one
18  guy is the hands man who actually goes and puts the
19  individual in cuffs when they have to be cuffed.
20   Q   Do you remember, approximately, how many
21  trainees you were training at the time this shooting

Deposition of Ofr. Efren Edwards

Raymond Gray, et al v. Officer William Scott Kern, et al

Page 50

1  occurred?

2      A   Me?

3      Q   Yes.

4      A   I had -- I had my half of the class up on

5  my level.  But I was in -- individually training

6  three.  But the other -- there were -- the other

7  portion of my class was up on my level.

8          Officer Kern's portion was down on his level,

9  and I guess he had the other three in his area that he

10 was training.

11     Q   Do you know where these -- I guess we'll

12 refer to them as people waiting to be trained next by

13 Officer Kern --

14     A   Where were they?

15     Q   You told me where they were, but -- well,

16 maybe you should be more specific where they were.

17     A   I can tell you the portion that I was --

18 where my class was, where they were.  If I were here,

19 training --

20     Q   You're indicating upper level?

21     A   On the upper level, I had my trainees

Page 51

1  stand off out into the hallway area, out of harm's

2  way of the actual place that we were training so they

3  couldn't observe what we were doing, because I want

4  them not to get -- or not to see what they're

5  actually doing until they're instructed to do it.

6          I can't tell you where Officer Kern's half

7  was because, I mean, that was his job, to put them in

8  the location where they would not be able to see or

9  secure -- or in a secure location where they would not

10 be, possibly, injured.

11     Q   Well, the hallway, would you say that was

12 out of harm's way?  The hallway where Gray and the

13 others were waiting, would that have been out of

14 harm's way?

15         MR. ZOLLICOFFER:  Objection; calls for

16 speculation.

17 BY MR. RABINEAU:

18     Q   You may answer.

19     A   I'm not -- because I didn't actually see

20 it until it actually happened, I couldn't tell you.

21     Q   Well, you're familiar where the bunker

Page 52

1  training was going on?

2      A   Yes.

3      Q   Where would you have put trainees who were

4  waiting where you would have thought that it was a

5  safe area, in your judgment?

6          MR. ZOLLICOFFER:  Objection; speculation.

7  Are you asking him a hypothetical?

8          MR. RABINEAU:  I'm not.

9  BY MR. RABINEAU:

10     Q   You regularly train people in various

11 training, including bunker training, correct?

12     A   Yes.

13     Q   And, obviously, you had never trained at

14 that facility in bunker training, correct?

15     A   Other than the day before.

16     Q   Had you trained them in bunker training

17 the day before?

18     A   No.

19     Q   So, I'm saying, you had never trained

20 trainees at that facility in bunker training?

21     A   Myself individually, no.

Page 53

1      Q   But if you had been in that position to

2  train people in that facility, would you have

3  considered the hallway a safe area?

4          MR. ZOLLICOFFER:  Objection; calls for

5  speculation.

6  BY MR. RABINEAU:

7      Q   You can answer.

8      A   I would have put them in a location far

9  out of harm's way and definitely not where they could

10 see the training.

11     Q   When you conduct bunker training, did you

12 tell the trainees in advance that they are not

13 supposed to look at the training going on before they

14 are trained?

15     A   That would have been Officer Kern's job.

16     Q   But I'm asking you.

17     A   What are you asking me?

18     Q   Do you regularly tell people when you do

19 bunker training that they're not to observe the

20 training prior to the time they're actually involved

21 in the scenario?

Page 54

1   A   I give them instructions that if I'm
2   training three trainees and I give them a location,
3   that they are to stay at this location until they are
4   called individually.
5   Q   While you had been doing bunker training
6   in the past, were you ever in a situation where
7   trainees were looking through a window, contrary to
8   your instructions?
9   A   I can't recall that ever happening to me.
10   Q   When you were doing your training on the
11   upper level, I think you indicated that the trainees
12   were in a hallway?
13   A   Yes.
14   Q   Did that hallway differ in any way from
15   where the trainees were on the lower level?
16   A   Minor.
17   Q   What was the minor difference?
18   A   The hallway where I had -- my trainees
19   were -- they weren't, actually, in a hallway; they
20   were actually in a room down the hallway from where I
21   was doing my training.  I secured my trainees in a

Page 55

1   classroom down the hall.
2   Q   On the lower level --
3   A   On the upper level.
4   Q   Now, I'm referring to the lower level; was
5   there a classroom down the hall?
6   A   If I remember correctly, yeah, I think
7   there was.
8   Q   You're pretty sure of that?
9   A   I think so, yeah.
10   Q   Do you know the term, "fatal funnel?"
11   A   Yes, sir.
12   Q   What does the term mean?
13   A   Fatal funnel could pertain to a window,
14   hallway, stairway, doorway.  That split-second when
15   an officer makes entry that can be considered an
16   ambush point.
17   Q   Did you consider the hallway on the lower
18   level a fatal funnel?
19       MR. ZOLLICOFFER:  Objection; calls for
20   speculation.
21       THE WITNESS:  If it -- if there were an

Page 56

1   actual incident happening, yes, I would consider it a
2   fatal funnel, yes.
3   BY MR. RABINEAU:
4   Q   A fatal funnel pertains to a specific
5   situation, correct?
6   A   Yes, sir.
7   Q   And in that situation, there would have to
8   be something constituting a threat to be a fatal
9   funnel, wouldn't it?
10   A   Yes.
11   Q   Did you know of any threatening situation
12   in that hallway where Officer Gray was shot?
13       MR. ZOLLICOFFER:  Objection; calls for
14   speculation.
15       THE WITNESS:  Unaware, sir.
16   BY MR. RABINEAU:
17   Q   Under your definition of fatal funnel,
18   isn't it correct that was not a fatal funnel?
19   A   That's not what I said.  I said that I
20   would consider that a fatal funnel in an actual
21   incident, yes.

Page 57

1   Q   But there was no actual incident at this
2   time?
3   A   No, sir.
4   Q   At the time you testified at Officer
5   Kern's trial, you testified you were suspended at
6   that time as a result of the incident; is that
7   correct?
8   A   Yes, sir.
9   Q   And for what reason were you suspended?
10   A   When I spoke to my attorney and I spoke to
11   the investigator
12   Q   Well, don't tell us what -- your
13   discussion with your attorney.
14       MR. ZOLLICOFFER:  Can we have a break for a
15   moment?
16       MR. RABINEAU:  Sure.  You want to talk to
17   him?
18       MR. ZOLLICOFFER:  No.  I want to talk to
19   you.
20       (Brief recess.)
21       MR. RABINEAU:  I'm going to withdraw that

Page 58

last question.

MR. PETTIT: I have a family medical
situation I have to attend to.

(Whereupon, Mr. Pettit left the room.)

MR. RABINEAU: I think I'm just about done.

BY MR. RABINEAU:

Q   Do you agree that under rules and
regulations pertaining to the training, trainers are
not allowed to fire at someone not in the training?

A   You're asking me am I aware of the rules
and regulations that, as an instructor, you're not
supposed to fire at a trainee under rules and
regulations of simunitions, or firearms instructor?

Q   I'm talking about simunitions. That if
someone is not involved in the simunitions training,
an observer, let's say, or someone waiting for
training, you're not allowed to fire at that
individual?

MR. ZOLLICOFFER: Do you understand the
question?

THE WITNESS: I understand exactly what

Page 59

he's saying. But I guess the best way I can answer
that is through your --

MR. ZOLLICOFFER: First of all, it's a yes
or no.

THE WITNESS: Well, yeah, I'm aware of it.
But I was trying to explain something.

BY MR. RABINEAU:

Q   You can explain.

A   Okay. Under no circumstances are you to
fire at an observer who is just observing. There
would never come a time where you are firing at an
observer, whether that observer would be in full gear
or not. It's just not allowed.

Q   I've recently, actually a couple of hours
ago, received your Answers to Interrogatories. And
would you look at Interrogatory number 16? The
Answer -- I have a question about the Answer. Take
your time. But when you're finished, if you'll let
me know.

A   You're asking me if --

Q   There's no question. I'm only asking you

Page 60

to read it.

A   Okay.

Q   Now, in Answer number 16, you refer to a
text message that you sent out after Officer Kern's
criminal trial?

A   Yes.

Q   You say you don't recall the exact
wording?

A   Not the exact wording, no, sir.

Q   Can you tell us as much as you can
remember what you did say in that?

MR. ZOLLICOFFER: Objection; speculating.

BY MR. RABINEAU:

Q   You may answer.

A   It was along the lines of I was
disappointed in the findings that Baltimore County
determined with Officer Kern.

I said that I didn't believe that it was an
accident. I said that I would do everything in my
power to prove that I think he had purposely shot
Officer Gray. But I don't know the exact wording.

Page 61

Q   What do you base that on?

A   There were a number of things. Officer
Kern was an individual -- he was the type of
instructor who refused to follow directions. He was
reprimanded on several occasions by several
supervisors while being an instructor at education
and training. He was charged by several supervisors.
He was recommended to be removed from education and
training.

He verbally stated that he did not like his
sergeant. He verbally stated that he did not like
President Obama, being a black President. He verbally,
constantly and consistently, showed individual -- I
don't know, dislike to a particular group of trainees,
particular African-American males, with each one of the
classes that he instructed.

He was brought up on an EEOC Complaint by a
supervisor, who is no longer with the department, by
the name of Nikki Bennett.

There were several occasions where
individuals had approached me and other instructors and

Deposition of Ofr. Efren Edwards                                    Raymond Gray, et al v. Officer William Scott Kern, et al

Page 62

1   had voiced their opinion about the abusive manner that
2   Officer Kern treated them.
3       Q   Were you going to say, treated
4   African-Americans?
5       A   Yes, sir.
6       Q   So, you believe he was racially biased
7   against African-Americans?
8       A   Yes, I do.
9       Q   Did he ever express that directly to you?
10      A   No, sir.  No, he didn't.
11      Q   Did he ever directly express it to anybody
12  that you knew, who later told you that?
13      A   No, sir.
14      Q   Is your conclusion based merely on your
15  observations?
16      A   Not just observation, but documentation.
17      Q   What documentation?
18      A   There are several supervisors who were in
19  the past Officer Kern's supervisors who had
20  documentation.  The department is well aware of the
21  EEOC Complaint that was filed against Officer Kern

Page 63

1   against a black female.  He was reprimanded and asked
2   to be removed from education and training.
3       MR. ZOLLICOFFER:  Objection.
4       MR. RABINEAU:  I'm going to object to you
5   interrupting him.
6       MR. ZOLLICOFFER:  I'm going to object
7   because you're soliciting personnel information from
8   one officer about another that you know is
9   inappropriate.
10      MR. RABINEAU:  I don't know that that's
11  inappropriate at all.
12      This man -- I'm sorry; I don't want to refer
13  to you as just a man.  This officer has indicated that,
14  in his opinion, this was an intentional act.
15      MR. ZOLLICOFFER:  I understand that.
16      MR. RABINEAU:  And I think I'm entitled to
17  explore the basis of his opinion.  And to hold him
18  back, I think, is an obstruction.
19      MR. ZOLLICOFFER:  I made an objection.
20      MR. RABINEAU:  Okay.
21      In other words, you may continue, if you

Page 64

1   recall where you were.  That can be read back to you.
2       (Whereupon, the court reporter read back from
3   the record as follows:
4       A   He was reprimanded and asked to be
5   removed from education and training.)
6       THE WITNESS:  By Sergeant Darrell Jackson.
7   He was asked to be removed by --
8       MR. BELL:  I object.  I believe the question
9   was to documents.
10  BY MR. RABINEAU:
11      Q   You can continue.
12      A   The documents were in the possession of
13  Sergeant Darrell Jackson.  The documents are in
14  possession of Lieutenant Jody McFadden.  I'm quite
15  sure that internal investigation has a record of
16  these incidents and documentation.
17      Ronald Fleming, who is no longer with the
18  Department I particularly remember an incident where he
19  charged Officer Kern for being abusive to several
20  trainees.
21      Q   Were they all African-American?

Page 65

1       A   To my recollection, yes, sir.
2       Q   I'm sorry I interrupted you.  I shouldn't
3   have.
4       A   No, I'm done.
5       Q   If you still have your Answers to
6   Interrogatories, if you would look at -- the pages
7   are not numbered.
8       But in your Answer to Interrogatory number 18
9   -- if you want to read the whole thing, you can, but I
10  don't think you really have to.
11      The last paragraph on the second page that
12  starts, the accident happened on Tuesday.  Officer
13  Edwards and two trainees both reminded Kern to remove
14  his weapon before training began, I take it from your
15  prior testimony, you were not present when that
16  occurred?
17      A   I'm not sure what you're saying.
18      Q   Well, you're indicating there that before
19  the accident happened on Tuesday, that there were two
20  trainees --
21      A   Yes.

Page 66

1   Q   -- who asked or reminded Officer Kern to
2   remove his weapon?
3   A   Yes, sir.
4   Q   So, according to this Answer, it means to
5   me that they told him that he had his weapon, he
6   should remove it?
7   A   Yes, sir.
8   Q   But, based on your prior testimony, I
9   thought -- were you present when that happened?
10   A   When the trainees told Officer Kern to
11   take his weapon off?  I was in the building, but I
12   did not hear them say that, though.
13   Q   How did you later find out about it?
14   A   During the course of testimony and
15   afterwards, I actually spoke to the trainees
16   afterwards.
17   Q   Do you recall who the two trainees were?
18   A   At the court proceeding, they -- I can't
19   remember their names -- they told me that they
20   actually spoke to Officer Kern individually and
21   stated that they reminded him -- Officer Kern had

Page 67

1   pulled his weapon from his -- from underneath his BDU
2   blouse and pointed the weapon at Officer Gray.
3       One of the trainees told me that he
4   recognized it not to be a simunition weapon and he
5   advised Officer Kern immediately that he had a live
6   weapon on his person.  He advised Officer Kern that
7   that is a safety violation.
8       And Officer Abel -- what Officer Kern's
9   statement was, something to the effect of "that's
10   muscle memory," which does not abate the fact that you
11   have a live weapon in a simunition training scenario.
12   That should have been enough for him to take that
13   weapon off.  He did not.
14       Had he, let's say, honestly forgot that he
15   had it on him, once the trainee advised him --
16   MR. BELL:  Objection.
17   THE WITNESS:  -- once he advised him he had
18   his weapon on him, that should have been enough for
19   him to remove it.
20   BY MR. RABINEAU:
21   Q   Have you ever been on a firing range with

Page 68

1   Officer Kern at the same time, wherein you both were
2   firing at targets?
3   A   Yes.
4   Q   On more than one occasion?
5   A   I can remember one incident when we had to
6   get our certifications through -- we were out at
7   Gunpowder Range.  But other than that, I don't think
8   we've actually been on the actual firing range at the
9   same time.
10   Q   Did you have enough period of observation
11   to form an opinion as to his accuracy or expertise in
12   firing the weapon?
13   A   From a firearms perspective?
14   Q   Yes.
15   A   Officer Kern --
16       MR. BELL:  Objection.  This part is a yes or
17   no question, but it seems like he's answering -- so I
18   would object.
19       MR. RABINEAU:  To save time, really.
20       THE WITNESS:  Under my observation as a
21   firearms -- a certified firearms instructor, Officer

Page 69

1   Kern is not a very good -- proficient -- or is not
2   extremely proficient with his weapon under time
3   stress; I've actually observed that.
4   BY MR. RABINEAU:
5   Q   What do you mean by, "time stress?"
6   A   If you have -- one portion of your
7   certification, you have ten seconds to get all five
8   rounds.  Officer Kern is not good at firing his
9   weapon under stress.
10       If Officer Kern takes his time, let's say he
11   has more time than ten seconds, let's say he has 30
12   seconds, if he can take his time, find his sights,
13   control his breathing, easy trigger pull, he can hit
14   his target.
15       But, under stress, I've witnessed only that
16   short, brief time that I've seen him, he is not good at
17   firing his weapon under stress.
18       MR. RABINEAU:  Witness with you.
19       MR. MAYHEW:  Yes, I have a couple questions.
20   BY MR. MAYHEW:
21   Q   I introduced myself earlier.  I'm Paul

Page 70

Mayhew.  I represent Baltimore County.

I'm interested a little bit in following up on your conversation with Jimmy Bossi, who was a Baltimore County SWAT officer.

A   Yes, sir.

Q   And your relationship with him is simply a professional colleague, one SWAT guy to another?

A   We used to work together in Baltimore City.  Jimmy then resigned from Baltimore City and joined Baltimore County.

Q   And in looking for a facility to conduct this bunker and other training, you thought of Jimmy because you knew he was now with the County and he might be able to help; is that fair?

A   Yes, sir.

Q   He was one of several people you called in other agencies?

A   I called two other people, but Jimmy was the first guy to get back to me.

Q   And he referred you to this Rose Lambert?

A   Yes, sir.

Page 71

Q   If you know, who is Rose Lambert employed by?

A   I think she's employed by the State.  I'm not exactly sure.  Because it's a State facility.

Q   You then met face-to-face with her?

A   I met with the security officer.  I spoke to her on the phone.

Q   And the security officer gave you the keys and a little tour of the place?

A   Yes.

Q   And you were satisfied that it looked like a suitable place for the training you were going to conduct?

A   Yes.

Q   Did you have any further contact with Officer Bossi after he referred you to Rose Lambert?

A   Yes, I did.

Q   And in what way?

A   Well, I -- actually, Jimmy's son was a member of that class.  He's a City trainee, Baltimore City trainee.

Page 72

I called Jimmy up a couple times afterwards and I advised him that his son was a great trainee, that he was doing a good job, he should be real proud of his son.

I asked him how things were going, how did he like Baltimore County.  He told me he was about to be promoted to corporal, he was on the corporals' list, he was about to be promoted.  But other than that, we didn't have any other conversation.

Q   Did Officer Bossi or any other Baltimore County personnel participate in the training at Rosewood that you and Officer Kern were conducting?

A   No.

Q   Did you see anyone from Baltimore County at the facility on the days you were training?

A   Not the first day.  But after the incident, several Baltimore County officers responded.

Q   Because Rosewood happens to be located in Baltimore County, is that what you surmise?

A   Yes.

Page 73

Q   Do you know the extent to which Baltimore County conducted any investigation of the incident, versus the state police?

A   I was actually interviewed by the Baltimore County Investigative Unit.  They came out, they questioned me about the incident.

Q   On the day of the incident?

A   On the day of the incident, yes, sir.

Q   They questioned you at the Rosewood facility?

A   Yes, sir.

Q   So, within an hour or two of the shooting?

A   Probably a little later than that.  It was probably, maybe, four or five hours afterwards.

Q   The other question I have is, Mr. Rabineau asked you about your text message following the criminal court proceeding, or at least a day of it.  I believe you said you were disappointed that Baltimore County had concluded that this was an accident?

MR. ZOLLICOFFER:  Objection; I think that's

Deposition of Ofr. Efren Edwards                    Raymond Gray, et al v. Officer William Scott Kern, et al

Page 74

a mischaracterization.

BY MR. MAYHEW:

Q   I'm trying to understand.  Feel free to correct my misunderstanding.

A   I didn't say that I was -- I was disappointed that they found him not guilty on the assault charge.

Q   You're speaking of a jury?

A   The jury, yes.

Q   Okay.  I get it.  One last thing: it's your belief that Officer Kern intentionally shot Mr. Gray?

A   Yes, sir.

Q   Do you mean by that that he intentionally -- or he thought he was shooting him with his simunitions weapon, or that he intentionally shot him with his -- with a live round?

A   He intentionally shot him with his service weapon.

Q   Why do you believe he was so distraught after he did that, then?

Page 75

A   Officer Kern, over the years that I've known him, had displayed a demeanor of refusing to follow rules and regulations.  He particularly had a demeanor of refusing to follow directions from black supervisors, whether it be a black female or a black male.

Officer Kern also displayed an attitude toward black trainees.  He had a history of abusing his authority toward black trainees, particularly African-American men.

MR. MAYHEW:  No further questions.

BY MR. BALL:

Q   Good morning.  Chaz Ball.  I'll be asking you some questions as well.

We'll start with this: you were the officer who found the facility on behalf of the Baltimore Police Department; is that correct?

A   I didn't find it.  I was given an opportunity to work -- I didn't find it.  Officer Bossi recommended it.

Q   And it was recommended to you for the

Page 76

training procedure, correct?

A   Yes.

Q   And you were the officer who actually inspected the facility for the Baltimore Police Department; is that correct?

A   Yes.

Q   You were the officer who had it approved to be used for training for the Baltimore Police Department; is that correct?

A   I didn't actually approve it.  I had someone approve it for me.  But I didn't actually approve it for --

Q   But you had it approved; is that correct?

A   Yes.

Q   And you actually had it put on the schedule; is that correct?

A   I advised Officer Choi of the location, and she put it on the schedule.

Q   And you advised Officer Choi, knowing that Officer Choi was going to have the trainees go to that facility, is that right?

Page 77

A   Yes.

Q   And you also made sure that Officer Choi let Officer Kern know that was the facility that would be used; is that correct?

A   Yes.

Q   And, in your opinion, if the facility wasn't a safe facility, would it be a result of your decision to use the facility?

MR. ZOLLICOFFER:  Objection.

You may answer.

THE WITNESS:  If it were unsafe?  I wouldn't have used it if I thought it was unsafe.

BY MR. BELL:

Q   From the Baltimore Police Department and the training -- specifically from the training and education department, that decision came from you to use that facility, is that right?

A   Not exactly, no.  If my supervisor would have told me not to use it, I would not have used it.

Q   But your supervisor didn't inspect the facility?

Deposition of Ofr. Efren Edwards                    Raymond Gray, et al v. Officer William Scott Kern, et al

Page 78

1  A   No.
2  Q   Your supervisor's supervisor, the
3  lieutenant, didn't inspect the facility, is that
4  correct?
5  A   No.
6  Q   The commissioner didn't inspect the
7  facility?
8  A   No.
9  Q   Ms. Choi didn't inspect it, either?
10 A   No.
11 Q   You talked about the concept of a fatal
12 funnel, is that right?
13 A   Yes.
14 Q   Fatal funnel is a very important concept
15 in the training of officer safety, is that right?
16 A   Yes, it is.
17 Q   In the real world, if someone walks into a
18 fatal funnel, they can be hurt, correct?
19 A   Yes.
20 Q   They can be killed, correct?
21 A   Yes.

Page 79

1  Q   So, it's immensely important in training
2  officers that they should stay away from those
3  dangerous — from placing themselves into those
4  dangerous positions, correct?
5  A   Yes.
6  Q   And as part of your training or as part of
7  the training you would have performed, you would
8  teach the trainees of the dangers of these
9  situations; is that correct?
10 A   Yes.
11 Q   And if you were actually in the course of
12 a live training or a scenario and someone were to
13 walk into one of these areas and you were playing a
14 bad guy, you would shoot one if they came into one of
15 these areas?
16 A   While conducting the scenario, yes, sir.
17 Q   That's because the danger in those
18 specific areas is very clear, is that right?
19 A   Yes, sir.
20 Q   And when you would do that, that would be
21 part of the training procedure, is that right?

Page 80

1  A   As long as it's based upon our scenario
2  training, yes.
3  Q   But you think it's immensely important
4  that they know about the dangers of these situations,
5  is that right?
6  A   Yes.
7  Q   You talked about — you were asked a
8  question about why you believed Officer Kern was so
9  distraught when he ran to you.  And you answered that
10 he had this history of his treatment of
11 African-Americans, supervising, or African-Americans
12 he was training.
13 But I believe the question was, given how you
14 observed him, why do you think he was so distraught?
15 A   I can't answer that question, sir.  I
16 really can't answer that question.  I can only tell
17 you what I've observed over the years.  I can't --
18 exactly why he would be distraught?  I can't answer
19 that question.
20 Q   You've been in law enforcement for almost
21 28 years; 28 years in June, is that right?

Page 81

1  A   Yes.
2  Q   In the course of law enforcement, you've
3  done training, is that right?
4  A   Yes.
5  Q   You've been trained, obviously, through
6  the course of your initial training and in-service
7  every year, is that right?
8  A   Yes.
9  Q   As part of your job in law enforcement,
10 you have to read people, is that right?
11 A   Yes, sir.
12 Q   And you saw him as distraught on that day,
13 right?
14 A   After the incident, yes, sir.
15 Q   After the incident, you saw him as
16 distraught?
17 A   After the incident, yes, sir.
18 Q   Do you remember seeing him in that way and
19 being, like, he's faking it?
20 A   Could you clarify the question?
21 Q   Do you remember believing at that point

Page 82

1 that he was faking being distraught?

2 A   Possibly.  When Supervisor Jackson showed

3 up on the scene, he displayed an attitude of, I'm not

4 going down for this.  We shouldn't have been here.

5 If I'm going to go down, everybody is going to go

6 down.  This is the attitude that he took.

7 It wasn't an attitude that I believe someone

8 who had just almost taken someone's life -- because at

9 the time, we actually thought that he had took the

10 young man's life -- it wasn't the attitude of, you

11 know, I made a mistake.  It was the attitude of, I'm

12 going to blame whoever I can.  That's what I observed.

13 Q   In that moment of seeing him, my question

14 is, do you remember thinking, he's faking this?

15 A   Possibly, yes.

16 Q   Did you testify to that in the criminal

17 case?

18 A   No, I didn't.

19 Q   Have you told anybody that before?

20 A   Yes, I did.

21 Q   Did you text that to anybody on the day

Page 83

1 after you testified in the criminal case?

2 A   That he's faking it?

3 Q   That you thought he was faking being

4 distraught immediately after, when you saw him?

5 A   Not to that extent.  I didn't say, "faking

6 it," no.

7 Q   Did you say, "I didn't think he was really

8 running at me, I didn't think he was really upset;"

9 did you ever testify to that in the criminal case?

10 A   No.

11 Q   Did you ever testify in the criminal case

12 when you saw him immediately afterwards, the way he

13 was acting made you believe that he did it on

14 purpose?

15 A   No, sir.

16 Q   And your basis for believing he did it on

17 purpose is character issues that you have with him,

18 is that right?

19 A   To an extent, yes.

20 Q   And it's issues about which you perceive

21 to be racism on his part, is that right?

Page 84

1 A   Yes, sir.

2 Q   Now, you were in -- obviously, you were in

3 education and training, is that right?

4 A   Yes, sir.

5 Q   And education and training, that's a

6 position that's of great importance, is that right?

7 A   Yes, it is.

8 Q   It's a position that showed that you know

9 what you're doing, right?

10 A   Yes, sir.

11 Q   And you were also on the commissioner's

12 executive protection -- with the commissioner's

13 executive protection, is that right?

14 A   Yes.

15 Q   That's an honorable position, is that

16 right?

17 A   Yes, it is.

18 Q   I mean, because not everybody gets to be

19 executive protection for the commissioner or the

20 State's attorney or the Mayor, is that right?

21 A   Correct.

Page 85

1 Q   And it shows a great deal of respect for

2 what you do, is that right?

3 A   Yes.

4 Q   And it's an honor for you to have that

5 position, is that right?

6 A   Yes, sir.

7 Q   And that was taken away from you, is that

8 right?

9 A   I guess you could say that, yes.

10 Q   You were suspended and reassigned

11 somewhere else, is that right?

12 A   Yes.

13 Q   And you were put in a position that you

14 don't want to be in, is that right?

15 A   Correct.

16 Q   You referred to it earlier as

17 involuntarily reassigned, is that right?

18 A   Yes, sir.

19 Q   So, you're somewhere right now that you

20 would rather not be, is that right?

21 A   To an extent, yes, sir.

Page 86

1  Q   In your belief, if Officer Kern
2  intentionally shot Mr. Gray, or Officer Gray, I
3  should say, would it matter where it happened?
4  A   It wouldn't matter, no.
5  Q   So if he intentionally did it, it wouldn't
6  matter what facility it was at; is that correct?
7  A   No.
8  Q   And the only blame would be on Officer
9  Kern, is that right?
10  A   To an extent, yes.
11  Q   If he intentionally shot Mr. Gray, the
12  only blame would be on someone — on Officer Kern?
13  A   It would be perceived as, yes, the blame
14  would only be on Officer Kern, yes.
15  MR. BELL: I don't have anything else.
16  MR. ZOLLICOFFER: I have a couple
17  questions.
18  BY MR. ZOLLICOFFER:
19  Q   Officer Edwards, is there anything
20  particularly different about the Rosewood training
21  facility that you felt was inherently dangerous for

Page 87

1  training the officers on that day?
2  A   No, sir.
3  Q   Is there anything particular about the
4  Rosewood training facility that would have any impact
5  on any training officer adhering to the safety
6  protocols of the Baltimore City Police Department?
7  A   No, sir.
8  Q   Is there anything particular about the
9  Rosewood training facility that made you secure your
10  weapon any differently than you would have at any
11  other facility?
12  A   No, sir.
13  Q   Is there anything particular, in your
14  mind, about the Rosewood training facility that would
15  have made any other training officer do something
16  different with securing their weapon?
17  A   My belief? No, sir.
18  MR. ZOLLICOFFER: Thank you.
19  MR. MAYHEW: I have nothing based on that.
20  MR. ZOLLICOFFER: He'll read and sign.
21  (Whereupon, at 12:20 p.m., the deposition was

Page 88

1  concluded.)
2
3  CERTIFICATE OF DEPONENT
4
5
6  I hereby certify I have read and examined the
7  foregoing transcript, and the same is a true and
8  accurate record of the testimony given by me.
9  Any additions or corrections I feel are
10  necessary I will attach on a separate sheet of paper to
11  the original transcript.
12
13
14
15
16
17
18
19
20  _____
21  Officer Efren E. Edwards, Senior

Page 89

1  C E R T I F I C A T I O N
2
3  I, Mary McKeon, Registered Professional
4  Reporter and Notary Public for the State of Maryland,
5  do hereby certify I stenographically reported the
6  foregoing proceedings on the date and time indicated
7  after the witness was duly sworn by me.
8  I, further, certify I am not an employee of
9  nor related to nor acquainted with any of the parties
10  to this action and am not financially or otherwise
11  interested in the event of such action.
12
13
14
15
16
17
18
19
20  _____
21  Mary McKeon, RPR