EXHIBIT E

ORIGINAL

1             IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3

4        ----------------------------------------------X

5    RAYMOND GRAY, et al.,          *

6             Plaintiffs           *

7    vs.                           *   CASE NUMBER:

8    OFFICER WILLIAM SCOTT KERN,   *   1:13-CV-02270-WMN

9    et al.,                       *

10            Defendants           *

11       ----------------------------------------------X

12

13         The Deposition of WILLIAM KERN, held at

14   SCHLACHMAN, BELSKY & WEINER, P.A., on Thursday,

15   December 11, 2014, from 10:15 a.m. to 11:00 a.m.,

16   before Emily Rose Hoffman, Notary Public for the

17   State of Maryland.

18

19

20

21

Page 2

```
 1          A P P E A R A N C E S
 2
 3   On behalf of the Plaintiffs:
 4      ALLAN B. RABINEAU, ESQUIRE
 5        LAW OFFICES OF ALLAN B. RABINEAU
 6        401 East Pratt Street
 7        Suite 2252
 8        Baltimore, Maryland 21202
 9        (410) 837-9150
10
11   On behalf of the Plaintiffs:
12      A. DWIGHT PETTIT, ESQUIRE
13        A. DWIGHT PETTIT, P.A.
14        3606 Liberty Heights Avenue
15        Baltimore, Maryland 21215
16        (410) 542-5400
17
18
19
20
21
```

Page 3

```
 1          A P P E A R A N C E S, continued:
 2
 3   On behalf of the Defendant Kern:
 4      MICHAEL L. MARSHALL, ESQUIRE
 5        SCHLACHMAN, BELSKY & WEINER, P.A.
 6        300 East Lombard Street
 7        Suite 1100
 8        Baltimore, Maryland 21202
 9        (410) 685-2022
10
11   On behalf of the Defendants Russell and Edwards:
12      PATRICK D. MCKEVITT, ESQUIRE
13        WHITEFORD, TAYLOR & PRESTON, LLP
14        Seven Saint Paul Street
15        Baltimore, Maryland 21202
16        (410) 347-8700
17
18
19
20
21
```

Page 4

```
 1          A P P E A R A N C E S, continued:
 2
 3   On behalf of the Defendant Baltimore County:
 4      PAUL M. MAYHEW, ESQUIRE
 5        BALTIMORE COUNTY OFFICE OF LAW
 6        400 Washington Avenue
 7        Second Floor
 8        Towson, Maryland 21204
 9        (410) 887-4420
10
11
12
13
14
15
16
17
18
19
20
21
```

Page 5

```
 1          P R O C E E D I N G S
 2
 3          WILLIAM KERN,
 4   having been duly sworn, testified as follows:
 5      EXAMINATION BY MR. RABINEAU:
 6   Q    Mr. Kern, my name is Allan Rabineau.
 7   Mr. Pettit and I represent Raymond Gray in this
 8   particular case.
 9          Has your deposition ever been taken
10   before?
11   A    No.
12   Q    Well, if during the deposition you
13   don't understand a question, you are free to ask
14   me to rephrase the question or repeat it if you
15   don't get it the first time.
16          If you need a break for any other
17   reason, you can just say you need a break.  Okay?
18          Do you have any questions before we
19   start?
20   A    No.
21   Q    On February the 12th, 2013, did you
```

Deposition of Officer William Scott Kern                    Raymond Gray, et al v. Officer William Scott Kern, et al

Page 6

1    shoot Raymond Gray?

2        A    I accidently shot Raymond Gray, yes.

3        Q    My next question was going to be why?

4        A    I withdrew my -- what I intended to be

5    my simunitions weapon and fire a round into a

6    wooden door that the round wouldn't penetrate, nor

7    would it go through to the other side.  And I

8    accidently withdrew the wrong weapon.

9        Q    Now, this was during the course of a

10   training exercise through the Baltimore City

11   Police Department; is that correct?

12       A    Yes.

13       Q    Would you tell us what the nature of

14   that training exercise was?  Did it have a

15   specific name?

16       A    Tactical training.

17       Q    And very briefly, describe what was

18   going on in that training.

19       A    We were doing bunker instruction.  We

20   were doing how to enter rooms, how to search

21   places, how -- the aspects of tactical searching

Page 7

1    and entering buildings and houses.

2        Q    And you were an instructor?

3        A    Yes.

4        Q    And you were an instructor in what

5    specific training?

6        A    That day?

7        Q    Well, I want to know what all your

8    training as an instructor.

9        A    Oh, I'm an EVOC instructor.

10       Q    That's emergency vehicle --

11       A    Emergency vehicle operations course

12   instructor.  Defense tactics instructor.  It all

13   just left me.  Tactical instructor.  PT, physical

14   training.  Classroom, various classroom

15   instructions.

16       Q    Now, this particular exercise that was

17   going on, what training would that fall under?

18       A    Tactical instruction.

19       Q    That would be tactical instruction.

20            How long had you been a tactical

21   instructor?

Page 8

1        A    Probably eight years or so.

2        Q    And the training that was going on, it

3    was tactical instruction but was it called bunker

4    instruction?  How would that particular exercise

5    be classified by you?

6        A    They are all under the same

7    tactical -- tactical instruction is different

8    levels, different aspects of it.

9        Q    And during this tactical instruction,

10   you used a, was it called a simulation?

11       A    Simunition.

12       Q    Simunition, excuse me.  And this

13   simunition, did it have a manufacturer or a model

14   number, do you recall?

15       A    It was a Glock T22.

16       Q    A Glock T, did you say 22?

17       A    I believe yes, 22.

18       Q    And your standard Glock weapon that

19   was issued to you as a member of the police

20   department, what model was that?

21            MR. MARSHALL:  Are you talking about

Page 9

1    live weapon or simunition weapon?

2            MR. RABINEAU:  No.  We're talking

3    about the live weapon that was issued.

4        A    The Glock 22.

5        Q    So the only difference that you recall

6    is one was a Glock T22 and the other was a Glock

7    22?

8        A    In the name?

9        Q    The simunition you had said was a

10   Glock T22, and the issued live weapon was Glock

11   22?

12       A    Mm-hmm.

13       Q    And I'm saying the only difference in

14   the name, the one has a T for the 22 and the other

15   does not?

16       A    That's correct.

17       Q    Because I'm going to refer to the two

18   weapons.  And I would -- well, you tell me, were

19   they similar in appearance?

20       A    Yes.

21       Q    Okay.  What was the -- what, if any,

Deposition of Officer William Scott Kern                 Raymond Gray, et al v. Officer William Scott Kern, et al

Page 10

1    distinguishing features did one have that the
2    other didn't have?
3        A     The T22 has a blue handle.
4        Q     Is the entire handle blue?
5        A     Yes.
6        Q     Other than the blue handle on the T22,
7    they would appear the same to you?
8        A     That's correct.
9        Q     What particular training did you have
10   with the Glock T22?
11       A     Me personally?
12       Q     Yes.  You.  You.  Did you have any,
13   attend any courses?  Did you go to --
14       A     Simunitions instructor school.
15       Q     And do you recall approximately when
16   that was?
17       A     No.
18       Q     In the area of eight years, would you
19   think?
20       A     Well, in that span of time, I went
21   through probably two or three recertification

Page 11

1    schools.
2        Q     Prior to the day in question, when had
3    the last recertification school occurred?
4        A     I believe it was the prior year.
5        Q     Where was that held?
6        A     Gunpowder.
7        Q     The fire range?
8        A     Firearms range, yes.
9        Q     And who was the instructor at that
10   time?
11       A     I don't remember.
12       Q     Was it a member of the police
13   department or was it someone from the
14   manufacturer?
15       A     Manufacturer.
16       Q     But you don't recall who that was?
17       A     No, sir.
18       Q     During that particular course or any
19   other course that you had with respect to the
20   retraining on the Glock T22, was there any
21   discussion about having live weapons present on

Page 12

1    your person at the same time that you were
2    instructing with the Glock T22?
3        MR. MARSHALL:  Are you talking about
4    at the simunition training or just in general?
5        MR. RABINEAU:  I'm talking about this
6    training that he had at this school at Gunpowder.
7        Q     Either on that occasion or any prior
8    occasion, was there any discussion regarding
9    having a live weapon when you were engaged in a
10   training class with your trainees?  Having a live
11   weapon at the same time you were using the Glock
12   T22?
13       A     When you participated in the training
14   and were not part of the training, you were not to
15   be armed.
16       Q     And at the time that you fired that
17   weapon, were you participating?
18       A     No, I was not.
19       Q     But you had the weapon on you, the
20   Glock 22?
21       A     Yes.

Page 13

1        Q     And you had the Glock T22 on you?
2        A     Yes.
3        Q     During the course of that training
4    exercise that afternoon, did you use at any time
5    the Glock T22?
6        A     Yes.
7        Q     Okay.  So you had on you the live
8    weapon that afternoon at the same time that you
9    had actually fired a Glock T22?
10       A     Yes.
11       Q     Okay.  And in your classes that you
12   had, weren't you advised that this was not to be
13   done?
14       MR. MARSHALL:  Meaning wearing the
15   live weapon?
16       Q     Wearing a live weapon at the same time
17   you are firing a Glock T22.
18       A     I wasn't wearing it at the same time
19   as I was firing it.  I wasn't firing it.
20       Q     Well, when you fired your Glock T22,
21   did you have your weapon on you, your live weapon?

Deposition of Officer William Scott Kern

Raymond Gray, et al v. Officer William Scott Kern, et al

Page 14

1     A     Yes.

2     Q     So that's what I'm saying.  You had a

3  live weapon on you at the same time that afternoon

4  when you were firing the Glock T22?

5     A     But I fired my live weapon in mistake.

6     Q     I'm not talking about that.  I'm

7  talking about the fact that at some time that

8  afternoon, you've indicated that you fired the

9  T22.

10    A     No.  I intended to fire the T22.

11    Q     So you had intended to fire it, but

12  you had -- I thought you said you had fired the

13  T22 that afternoon?

14    A     No.

15    Q     But you had intended to fire the T22

16  that afternoon?

17    A     In that incident, yes.

18    Q     And at that instant that you were

19  firing that Glock T22, you obviously had a live

20  weapon on you?

21    A     Yes.

Page 15

1     Q     And I was asking you during the course

2  of your recertification or your original

3  training -- by the way, were all those classes

4  conducted by a representative of the manufacturer?

5     A     Yes.

6     Q     Weren't you told by the representative

7  that you were not to have a live weapon on you at

8  the time you were firing a Glock T22?

9     A     We were also told by the

10  representative to have the recommended number of

11  personnel on duty so that we wouldn't have that

12  happen.

13    Q     That's a good answer but it's not the

14  answer to the question that I asked.  Would you

15  please answer the question that I asked?

16    A     Would you repeat it?

17    Q     Yes.

18          I said, weren't you told during the

19  time of these -- the original class or the

20  recertification that you were not to have a live

21  weapon on you at the time that you were operating

Page 16

1  the Glock T22?

2     A     Yes.

3     Q     By whom are you currently employed?

4     A     FedEx.

5     Q     And in what capacity?

6     A     Handler.

7     Q     And since you were terminated by the

8  police department, have you had any other jobs --

9     A     No.

10    Q     -- of that nature?

11          Have you had any part-time jobs,

12  security or anything of that nature?

13    A     No.

14    Q     On this day or -- actually, it was an

15  afternoon when this occurred, after lunch; is that

16  correct?

17    A     Yes.

18    Q     You were at Rosewood; is that correct?

19    A     I believe that was the name, yes.

20    Q     Had you ever conducted a training

21  class there before?

Page 17

1     A     Other than the prior day was the first

2  day I'd ever been there or ever seen it or heard

3  of it.

4     Q     Before that time -- I guess this

5  happened on a Tuesday.  So the first day you had

6  been there was a Monday?

7     A     Yes.

8     Q     Before that time, you had on numerous

9  occasions conducted this same training exercise,

10  though, hadn't you?

11    A     Yes.

12    Q     Where had you on those previous

13  occasions?

14    A     Camp Fretterd military base, Dickman

15  Street garage, the Academy.

16    Q     And by the way, at the time this

17  happened, was an instructor your sole duty or did

18  you have other duties as a police officer?  Or

19  were you strictly assigned to training?

20    A     As it pertains to that day or as it

21  pertains to my general classification?

Deposition of Officer William Scott Kern                    Raymond Gray, et al v. Officer William Scott Kern, et al

Page 18

1   Q   In general.  Let's take an average
2   month.  In an average month at that time, what
3   percentage of your active duty time would you
4   spend training?
5   A   I don't understand "active duty time."
6   Q   Okay.  In other words, if there were a
7   special event in town, let's say the President's
8   coming to town --
9   A   We would be detail.
10   Q   So you were from time to time detailed
11   as well?
12   A   Yes.
13   Q   Okay.  That's all I'm asking.
14   A   Okay.
15   Q   That's all.
16       And how did it come about that on that
17   Monday and Tuesday that you were out training at
18   Rosewood where you had never been there?
19   A   That's where Officer Edwards told me
20   to go.
21   Q   Now, Officer Edwards, as I understand

Page 19

1   it, was also conducting on another floor some
2   training?
3   A   The same training, yes.
4   Q   The same training?
5   A   They are all the same tactical
6   training.
7   Q   And was one of you in charge as
8   opposed to the other?
9   A   It would be Officer Edwards.  It was
10   his class and he would be the senior officer.
11   Q   Other than just being senior officer,
12   would he have any other title --
13   A   No.
14   Q   -- that would distinguish what you
15   were from what he did?
16   A   No.
17   Q   When you trained in this particular
18   tactic, trained -- would you call them trainees, I
19   guess?
20   A   Yes.
21   Q   Police trainees?  Were you always

Page 20

1   working with Officer Edwards or did you work with
2   other officers as well?
3   A   During this --
4   Q   This particular training.
5   A   When we had other officers available,
6   yes, we would work with other officers.
7   Q   And when -- I was saying, were you
8   always with Officer Edwards?
9   A   Yes.
10   Q   So it was never a situation where you
11   would be the senior officer?
12   A   No.
13   Q   Had you ever in the past arranged
14   locations?
15   A   Only location I ever arranged was the
16   Camp Fretterd military blase.
17   Q   And why did you arrange that on that
18   occasion?
19   A   Because I had a relationship with the
20   military there and they allowed us to use their
21   training facility.  It was a very secure, very

Page 21

1   nice training facility.  We tried to use it as
2   much as we could.
3   Q   Why on this particular day were you at
4   Rosewood?  Why was Rosewood selected?
5   A   You would have ask Officer Edwards.  I
6   don't know.
7   Q   You were never a part of any
8   discussion regarding having your training that day
9   at Rosewood?  Is that what you are telling me?
10   A   No.
11   Q   Did you question him and ask him how
12   it was that he was able to get the facility to use
13   that day?
14   A   I questioned it on that Monday and
15   said I didn't like the facility.  It wasn't
16   conducive to what I thought we were doing, but
17   that's not my call.
18   Q   Why didn't you like the facility?
19   A   It wasn't secure in any manner.  You
20   could -- anybody could walk through it.  Anybody
21   could walk through the whole complex.  He stated

Deposition of Officer William Scott Kern                Raymond Gray, et al v. Officer William Scott Kern, et al

Page 22

1    that there was a rehabilitation facility on the
2    property. All the doors, once you entered any of
3    the buildings, immediately locked behind you and
4    you could not get out. So if you didn't leave the
5    door open or somebody on the other side didn't
6    have a key, you would be locked inside them. So
7    you literally had to leave the doors open to the
8    facilities we were training at. I didn't like any
9    of that.
10       Q     Let me jump back to Camp Frederick
11   [sic] for a moment. On how many occasions did you
12   train -- in this particular training aspect of the
13   tactical instruction, on how many occasions did
14   you do that at Camp Frederick?
15       A     Numerous. I couldn't tell you how
16   many. I have no idea.
17       Q     More than a dozen?
18       A     Yes.
19       Q     More than 50?
20       A     Over that amount of time frame, yes.
21       Q     Okay. During those occasions, did you

Page 23

1    ever have a live weapon on you while you were
2    training?
3        A     Yes.
4        Q     Did you on all those occasions?
5        A     Not on all those occasions, no.
6        Q     Why would you sometimes have a weapon
7    on you and sometimes not have a weapon -- a live
8    weapon?
9        A     If my job at that time was to be for
10   security for the group in the facility, then that
11   would be my job.
12       Q     And if you didn't feel that you had to
13   be the one to have security for the class, you
14   wouldn't have a weapon?
15       A     No. There would be somebody that
16   would have security that would have a live weapon.
17       Q     I see. So are you saying that you had
18   a live weapon on you at that time for the benefit
19   of the class?
20       A     To protect my recruits, yes.
21       Q     To --

Page 24

1        MR. MARSHALL:  You talking about the
2    day of this incident?
3        MR. RABINEAU:  The day this happened,
4    that afternoon.
5        Q     It is your testimony at this
6    deposition that you had that weapon on you to
7    protect the recruits?
8        A     Yes.
9        Q     Had anyone told you to do that?
10       A     No.
11       Q     Did you feel you had any special
12   relationship with them?
13       A     With my recruits?
14       Q     Yes.
15       A     Just the fact that I was -- I'm
16   responsible for them. That was -- I mean, when
17   you have classes or when you train, you are
18   responsible for the people that you train.
19       MR. MARSHALL:  Let me object. What do
20   you mean by special relationship?
21       MR. RABINEAU:  He just answered the

Page 25

1    question.
2        MR. MARSHALL:  Do you mean that --
3    well, there is a legal aspect of it and then there
4    is a layperson's --
5        MR. RABINEAU:  I think he gave me
6    the --
7        MR. MARSHALL:  Okay. I will note my
8    objection.
9        MR. RABINEAU:  He didn't answer yes or
10   no. He answered the way he wanted.
11       MR. MARSHALL:  Okay. Go ahead.
12   BY MR. RABINEAU:
13       Q     Had you any training with the use of
14   hand weapons, handguns before you joined the
15   police department?
16       A     No.
17       Q     Had you any training with handguns
18   other than a Glock?
19       A     I don't understand.
20       Q     In other words, while a member of the
21   Baltimore City Police Department, did you ever use

Page 26

1 any other hand weapon, service weapon --

2     MR. RABINEAU: You don't like when you

3 say revolver.

4   Q   -- other than Glock?

5   A   When I was initially trained in the

6 police academy in 1994, we started with the .38

7 and then we transferred to the Glock 9-millimeter,

8 but I never actually carried a .38.

9   Q   I understand.

10     Now, did you have to be retrained at

11 any point on the use of the Glock after initial

12 academy training?

13   A   You are trained once a year.

14 Recertification.

15   Q   Okay. And did you ever compete in any

16 marksmanship contests?

17   A   No.

18   Q   Had you ever fired your weapon in the

19 line of duty?

20   A   No.

21   Q   We weren't sure about this so I'm

Page 27

1 going to ask you. Have you ever received a

2 decision from the Court of Special Appeals

3 regarding your appeal?

4   A   No.

5   Q   Your original sentence, was it 30

6 days? The Circuit Court, at the trial.

7   A   It was 60 days.

8   Q   Sixty days. Did you serve your 60

9 days?

10   A   Yes.

11   Q   You have answered in your

12 interrogatories that you were terminated by the

13 department on April the 22nd of 2014.

14     Is that correct?

15   A   Yes, I believe it was.

16   Q   And do you recall on which charges,

17 which charges were sustained? Were all the

18 charges against you sustained?

19   A   I don't recall.

20   Q   You don't recall.

21     I had asked you a question, an

Page 28

1 interrogatory, and asked you if you ever testified

2 as a witness or deponent in any litigation or any

3 other action involving police misconduct --

4     MR. MARSHALL: Which one is that?

5     MR. RABINEAU: Number 14. In fact, if

6 you want to look it over, to save time.

7     MR. MARSHALL: Go ahead.

8   Q   Involving police misconduct, excessive

9 use of force, brutality, or harassment. Identify

10 the action, the case references. I wouldn't

11 expect you to know all that. And you answered

12 that -- you objected, I guess your attorney on

13 your behalf, but I'm going to ask you that

14 question again.

15     Have you ever testified -- you said

16 you haven't as a deponent, but have you as a

17 witness in any type of action?

18     MR. MARSHALL: Objection. You can

19 answer.

20   A   No. Not that I remember, no.

21   Q   Well, you testified at your own trial,

Page 29

1 correct?

2   A   Yeah.

3   Q   It's not a trick question, but you may

4 not realize the extent of the question.

5   A   Okay.

6   Q   Did you --

7   A   Yes, I testified at my own trial.

8   Q   But other than that, none of the other

9 categories would apply, police misconduct,

10 excessive use of force?

11   A   No.

12   Q   Now, following this incident, your

13 police powers were suspended initially; is that

14 correct?

15   A   Yes.

16   Q   Okay. Had your police powers ever

17 been suspended on any other occasion?

18     MR. MARSHALL: Objection. You can

19 answer.

20   A   The only one I can remember is the one

21 time that I didn't qualify, my yearly

Deposition of Officer William Scott Kern      Raymond Gray, et al v. Officer William Scott Kern, et al

Page 30

1   qualification. And as of January 1st, they were
2   suspended for three days so I could get to the
3   range to requalify.
4      MR. MARSHALL: Qualify meaning at the
5   range.
6      MR. RABINEAU: I understand.
7     Q    Now as far as any misconduct
8   proceedings, other than this one, have you ever
9   been charged with misconduct?
10    A    No, not that I -- not that I remember
11   or I know about.
12    Q    Do you know the name Rosemary Lambert?
13    A    No.
14    Q    Does the name 2916 Protective Guard
15   Services, does that mean anything to you?
16    A    No, sir.
17    Q    Do you know the name William Thomas
18   Jackson?
19    A    No, sir.
20    Q    Now, you have said you didn't know the
21   arrangement regarding Rosewood, how that came

Page 31

1   about, and you said you did know a little bit
2   about the military base.
3      Were there any other training
4   locations that you did know about; in other words,
5   that you knew by what directive you were using it
6   or any agreement?
7    A    The Dickman Street garage.
8    Q    Was that owned by the Baltimore City
9   Police Department, the garage?
10    A    I don't believe so. I believe it's
11   owned by the City. Or, let me -- I believe it's
12   privately owned now because I believe it was
13   bought.
14    Q    Do you know if the police department
15   still uses that facility?
16    A    As far as I know. When I left the
17   department, they were still use utilizing the
18   facility, yes.
19    Q    Can you describe that facility for me?
20   Was it just one big, open space, or were there
21   different rooms --

Page 32

1    A    There were different rooms. It was a
2   large -- it was our old central garage where they
3   worked on all the trucks and cars for the City.
4    Q    Would you consider -- when you were
5   using it, would you have considered that a safe
6   facility?
7    A    Yes. When we had a safety officer
8   outside, yes.
9    Q    Do you know why there was no safety
10   officer on this occasion?
11    A    Because there was only two of us. We
12   needed -- you needed a minimum of five or more.
13    Q    Did you have any discussions other
14   than with Officer Edwards regarding the need for
15   security officer there on that day?
16    A    That prior day, yes. When we first
17   got there.
18    Q    Who did you have that discussion with?
19    A    With Officer Edwards.
20    Q    Other than with him?
21    A    Oh, I asked people at the Academy.

Page 33

1    Q    Who did you ask?
2    A    Oh, wow. I have no idea. I just
3   remember you always -- when you're shorthanded,
4   you always ask at the academy who's available to
5   come out, and you notify your supervisor that, you
6   know, can you find me some help. And, evidently,
7   there was no help available that day or the next
8   day.
9    Q    On that Monday when you were out
10   there, were you actually engaged in training
11   trainees on that Monday?
12    A    Define what you mean by "engaged." I
13   was teaching, yes.
14    Q    Teaching, yes.
15    A    Yes.
16    Q    Okay. Did you have a live weapon on
17   you that day?
18    A    Yes.
19      MR. MARSHALL: Monday?
20      MR. RABINEAU: Monday.
21    Q    Yeah. So both of these days, you had

Page 34

1  a live weapon on you, Monday and Tuesday?
2      A    Those were my two days.  And Officer
3  Edwards was going to take Thursday and Friday,
4  which would be the next days we were going out
5  there.
6      Q    He was going to take -- when you say
7  "take"--
8      A    He was going to take the security
9  position that Thursday and Friday.
10     Q    So it's your testimony that Officer
11  Edwards intended to have a live weapon on him on
12  Thursday and Friday?
13     A    Yes.  To my knowledge, yes.  That's
14  what we discussed on Monday morning.
15     Q    And is it your testimony that he knew
16  you had a live weapon on your person that Tuesday?
17     A    Yes, it is.  That Monday as well.
18     Q    Okay.
19         Do you know who officer James Bosse
20  (phonetic) is?  Baltimore County Police
21  Department?

Page 35

1      A    No, sir.
2      Q    Never heard the name?
3      A    No, sir.
4      Q    I have been given a very poor copy.
5  It's Bates Kern 0940 and subsequent pages.
6         MR. MARSHALL:  I'm sorry.  What was
7  the number again?
8         MR. RABINEAU:  0940.  That's the best
9  quality.
10         MR. MAYHEW:  That was produced in
11  response to document request?
12         MR. RABINEAU:  Yes.  That was attached
13  to a request for production of documents.  And it
14  was -- I guess that was in the 900s of the pages,
15  so we probably have over 1,000 pages.
16         Maybe we should mark this as an
17  exhibit, please.
18         (Whereupon, Kern Deposition Exhibit
19  Number 1, Document, Kern Bates 0940 and following,
20  marked.)
21  BY MR. RABINEAU:

Page 36

1      Q    Mr. Kern, I'm showing you what's been
2  marked as Deposition Exhibit 1.
3         Do you recognize that particular
4  document?  It's a little difficult to read.  If
5  you need any help with it, I will try to read it.
6      A    I mean, it appears that it's something
7  from the Baltimore City police range, standard
8  operating procedures manual.
9      Q    Have you ever seen it before?
10     A    I don't have a copy of it.  I wasn't a
11  range instructor so I don't have a copy of the
12  range standard operating procedures.
13     Q    I understand that it pertains to the
14  Gunpowder range.
15     A    Yes, sir.
16     Q    It says it right there.
17         But my question to you is, have you
18  ever seen this before?
19     A    No, sir.
20     Q    Okay.  I don't know if you are aware
21  of this or not, but you have been named as a

Page 37

1  potential expert witness in this case.
2         Are you aware of that?
3      A    No, sir.
4      Q    I'm aware that sometimes people don't
5  know what their attorneys are doing with the legal
6  documents, but let me just tell you that this is a
7  document which indicates that -- each side had to
8  advise the other or amongst all of us any experts
9  that they intended to call and for what purpose.
10  And I'm going to read what it says.  It says,
11  Officer Kern is expected to testify as an expert
12  in police procedures, police training, firearms,
13  simunitions training, and law enforcement
14  generally as they relate to the matters alleged in
15  this case.
16         Now, first of all, I think you have
17  already answered the question, but do you
18  presently have any opinion regarding police
19  procedures that you intend to testify to in the
20  trial?
21     A    I don't know.

Page 38

1    Q    So you haven't been asked to give any

2  opinions as to any of the matters that I just

3  named; is that correct?

4    A    Not to my knowledge.

5    Q    Okay.

6         MR. RABINEAU:  So we would only ask if

7  you, in fact, you intend to use the officer, we

8  would like to -- or Mr. Kern --

9         MR. MARSHALL:  If he, for example, is

10 explaining what the standard operating procedure

11 is, to the extent you think that is sort of an

12 expert opinion, I mean, that's really what we're

13 talking about.  We've had objections, you know,

14 how can he testify -- if he's not an expert, how

15 can he testify as to what they're supposed to do,

16 what they're not supposed to do, and that's why we

17 list him as both a fact witness and then an

18 expert.

19        MR. RABINEAU:  Well, I think he would

20 be able to talk about rules and regulations that

21 he was trained in, but as far as --

Page 39

1         MR. MARSHALL:  Well, not all attorneys

2  agree with that.  That's why we do that.

3         MR. RABINEAU:  If he is going to talk

4  about standards, that's what we would like to

5  know.

6         MR. MARSHALL:  Yeah.  I think -- well,

7  again, he may tell -- and he has actually already

8  testified to in talking -- standards of having

9  safety officers there, you know, to ensure the

10 safety of unarmed people in the proceeding.

11 BY MR. RABINEAU:

12    Q    Let me go into that for a moment.

13        When you mentioned about having a

14 safety officer there, is there an actual document

15 or rule or regulation of the police department

16 that requires that?

17    A    Not to my knowledge.

18    Q    Do you recall how many trainees were

19 in this training class?

20    A    I believe it was 20.

21    Q    Okay.  Approximately 20?

Page 40

1    A    Approximately 20.

2    Q    And did you say Officer Edwards and

3  you were teaching the same training?  In other

4  words, what he was teaching in his room was the

5  same as what you were teaching in your room?

6    A    No.  We were teaching the same tactics

7  but not the same thing.

8    Q    How did his differ from what you were

9  training, you were teaching?

10   A    I was teaching bunkers and he was

11 teaching I believe room entries.

12   Q    Now, you were the class adviser to

13 this class; is that correct?

14   A    I believe so.

15   Q    What does a class adviser entail?

16   A    Being with the class when they go to

17 do things, mentoring the class when you had

18 opportunity to do so, being with them during

19 graduation.  If they had questions, they came to

20 you.

21   Q    So let's say they were being trained

Page 41

1  on some tactics or firing a weapon down at

2  Gunpowder Academy, would you still act -- would

3  you have acted as their class adviser in that

4  capacity?

5         In other words, if someone had -- I

6  guess they go to class adviser if they have a

7  problem or they don't get something.  Would that

8  be part of your duties as a class adviser, to

9  field a question from someone who may have been

10 trained with another instructor but they would

11 come to you?

12   A    If they asked a question after they

13 left that training.  Normally, they ask the

14 questions during that training, and they would ask

15 their adviser at the range for that.

16   Q    Okay.  How long had you been the

17 adviser to this training class, do you know?

18   A    I don't remember.

19   Q    You don't know when they started?

20   A    No, sir.

21   Q    You have a new class that starts every

Deposition of Officer William Scott Kern                    Raymond Gray, et al v. Officer William Scott Kern, et al

Page 42

1    month; is that correct?
2        A    We used to have new classes starting
3    every other month.
4        Q    Every other.
5            Did you know Raymond Gray before this
6    particular day?
7        A    No, sir.  Other than he was a recruit.
8    I don't remember names, nor do I learn the names.
9        Q    Were you aware that not all of the
10   people in your class were actually trainees of the
11   Baltimore City Police Department?
12       A    I believe so.  We got school police
13   sometimes.
14       Q    Do you know how that came about, that
15   arrangement?
16       A    No, sir.  We get the trainees we get
17   the date that their first day is.
18       Q    You don't know if any payment is
19   required from their force to Baltimore City Police
20   Department?
21       A    No, sir.

Page 43

1        Q    You don't know anything about that?
2        A    No, sir.
3        Q    Do you know whether Raymond Gray was a
4    Baltimore City Police Department trainee or a
5    trainee of some other police force?
6        A    I believe now he was a trainee of the
7    University of Maryland I believe is what it was.
8        Q    Was there anyone else in this class
9    that you were particularly friendly with, let's
10   say other than as a normal trainer and trainee?
11       A    No, sir.  I'm not friendly --
12       Q    You didn't have any social
13   relationship with them?
14       A    No, sir.  I'm there to train them and
15   that's it.
16       Q    And you knew none of them previously?
17       A    No, sir.
18            MR. RABINEAU:  I think I'm just about
19   done if I could have just about a minute.
20            (Recess -- 10:50 a.m.)
21            (After recess -- 10:52 a.m.)

Page 44

1            MR. RABINEAU:  I have no further
2    questions.
3            EXAMINATION BY MR. MAYHEW:
4        Q    Mr. Kern, my name is Paul Mayhew.  I
5    represent Baltimore County in this matter.
6            I just wanted to make sure, as far as
7    you know, there were no Baltimore County personnel
8    involved in the training that you and Officer
9    Edwards were conducting that day; isn't that true?
10       A    Yes.
11       Q    And are you aware of whether or not
12   the County uses the Rosewood facility on any
13   regular basis?
14       A    I'm not aware of it.  While we were
15   there, there were Baltimore County canine trucks
16   at another building.  I would imagine that they
17   were using it or something else was going on.
18       Q    Approximately how far was that
19   building from where you guys were doing your
20   training?
21       A    A hundred yards or so.

Page 45

1        Q    Okay.
2            MR. MAYHEW:  That's all I have.
3            EXAMINATION BY MR. MCKEVITT:
4        Q    Sir, my name is Pat McKevitt.  I will
5    have just a couple questions.
6            You testified that Officer Edwards
7    told you to go to the Rosewood facility; is that
8    correct?
9        A    Yes.
10       Q    When did that occur?
11       A    Typically, a couple weeks prior.
12            (Mr. Pettit leaves.)
13       Q    And did you two speak in person or how
14   did you communicate?
15       A    A text message.
16       Q    What was your reaction to the
17   instruction about the Rosewood facility?
18       A    I don't understand.
19       Q    Let me back up.
20            Do you recall specifically what
21   Officer Edwards told you?

Deposition of Officer William Scott Kern
Raymond Gray, et al v. Officer William Scott Kern, et al

Page 46

```
1    A    In the text?
2    Q    Yes.
3    A    Here's the address.  I got this place.
4  Here's the address.  Meet me there at 7:00 Monday
5  morning.
6    Q    This was a couple weeks prior,
7  correct?
8    A    Couple weeks prior is when he told me
9  about it.  And then I don't remember exactly when
10 the text was with the address and everything else.
11   Q    So am I correct in understanding there
12 was one conversation about the facility and then
13 the text followed?
14   A    There were numerous texts about the
15 facility.  He was trying to get it, I believe, and
16 then he got it.  And so on.
17   Q    Okay.  Do you recall approximately how
18 many text messages?
19   A    No, sir, I do not.
20   Q    And in any event, I take it that over
21 the course of a week or two -- or you tell me how
```

Page 47

```
1  long --
2         MR. MARSHALL:  Off the record.
3         (Off the record.)
4  BY MR. McKEVITT:
5    Q    Sir, we just took a break.  Let me
6  strike the last question and try to start over.
7         Trying to find out the specifics of
8  the text messages between you and Officer Edwards.
9  Do you recall anything being conveyed to you other
10 than the name and the location of the facility?
11   A    That would be it, yeah.  And, you
12 know, what time he was meeting me there.
13   Q    Did you give any communications back
14 to Officer Edwards about that subject?
15   A    I said, okay.  I'll see you there.
16   Q    And then that was the last of it until
17 the first morning of the training?
18   A    I believe so, yes.
19   Q    Did you have any communications with
20 anyone else about this particular training?
21   A    What do you mean?
```

Page 48

```
1    Q    Other than your text messages with
2  Officer Edwards, did you have any communications
3  with anyone else about the training we are talking
4  about?
5    A    About going there to do the training?
6    Q    Yes.
7    A    I notified my supervisors when I found
8  out the place and that's where we would be taking
9  the class and that's where I had to tell the class
10 to meet.
11   Q    Who was the supervisor that you
12 notified?
13   A    Sergeant Darryl Jackson.  And I don't
14 remember the lieutenant that was there that day or
15 prior to that.
16   Q    Other than Officer Edwards, Sergeant
17 Jackson, and this lieutenant, did you have any
18 communication with anyone else about the training?
19   A    Just the class when I had to tell them
20 to give them the address so they could meet us
21 there.
```

Page 49

```
1    Q    "The class" meaning the trainees
2  themselves?
3    A    The training class.
4         MR. McKEVITT:  Thank you, sir.  Those
5  are all my questions.
6         EXAMINATION BY MR. RABINEAU:
7    Q    In light of those, I have this one.
8         Was there an individual who was
9  considered the head or in charge of training?  A
10 major or a lieutenant or somebody?
11   A    We had a director.  There was a
12 director or maybe an acting director.  I don't
13 remember exactly.
14   Q    Do you recall who that was?
15   A    If it would have been acting director,
16 it would have been lieutenant -- oh, my gosh, I
17 can see the face.  I just can't get the name.  He
18 was our acting director when we -- in lieu of
19 having a director there, we had a lieutenant that
20 was the -- in charge of the whole entire education
21 and training division at the time.
```

Deposition of Officer William Scott Kern | Raymond Gray, et al v. Officer William Scott Kern, et al

Page 50

1    Q    You just don't recall his name?

2    A    I just can't remember his name.  I
3    mean, I can see who it is.

4    Q    You said when you got this Camp
5    Frederick -- if I understand you correctly, when
6    you got the Camp Frederick training facility or
7    when you were going to use it, you would check
8    with Sergeant Darryl Jackson?  Is that what you
9    said?

10   A    Yes.  He's my immediate supervisor.  I
11   would let him know that -- what I was going to do,
12   what time, and where I was going so he had an idea
13   of where he was, knew where I was.

14   Q    Do you know, may not know, did he have
15   to speak to anyone that was his superior to get --

16   A    I don't know.

17   Q    -- an okay?

18   A    I just kept my direct supervisor aware
19   of where I was conducting training.

20   Q    I'm just curious, why did you have to
21   find another place, like Rosewood?

Page 51

1    A    Sometimes the certain facilities
2    weren't available on the days that we had slotted.

3         I don't make the schedule.  Somebody
4    else makes the schedule.  They say, here's when
5    you are going to do this, here's when you're going
6    to do this, here's when you're going to do that.
7    Then you have to figure out which places you can
8    utilize in order to do the training.

9    Q    Did you ever have a situation where
10   training was scheduled but you couldn't find a
11   place?

12   A    No.  We always found a place.  Camp
13   Fretterd was always very good about working us in.

14   Q    So was it the distance that kept you
15   from going there more?

16   A    To Camp Fretterd?

17   Q    Yes.

18   A    Like I said, we went to Camp Fretterd
19   quite a bit.  It was Camp Fretterd's availability.
20   It is a military training facility, so they ran
21   training quite often.  And other jurisdictions, I

Page 52

1    believe, used Camp Fretterd as well, so it was
2    kind of, you know, you had had it just right in
3    order to get yourself in it.

4         MR. RABINEAU:  Thank you.  I have no
5    further questions.

6         MR. MARSHALL:  I have no questions.
7    We will read and sign.

8         (Signature having not been waived, the
9    deposition of WITNESS          was concluded
10   at 11:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

Page 53

1         CERTIFICATE OF DEPONENT

2

3         I hereby certify that I have read and
4    examined the foregoing transcript, and the same is
5    a true and accurate record of the testimony given
6    by me.

7         Any additions or corrections that I feel
8    are necessary, I will attach on a separate sheet
9    of paper to the original transcript.

10

11

12

13   _____

14         WILLIAM KERN

15

16

17

18

19

20

21

Page 54

```
 1              CONTENTS
 2        DEPOSITION OF WILLIAM KERN
 3           December 11, 2014
 4
 5           INDEX OF EXAMINATION
 6    BY MR. RABINEAU ............... 5
 7    BY MR. MAYHEW ............... 44
 8    BY MR. McKEVITT ............... 45
 9    BY MR. RABINEAU ............... 49
10
11           INDEX OF EXHIBITS
12        (Exhibit is not attached.)
13    No. 1   Document, Kern Bates 0940 and . . .35
              following
14
15
16
17
18
19
20
21
```

Page 55

```
 1    State of Maryland,
 2    County of Baltimore, to wit:
 3           I, Emily Rose Hoffman, a Notary Public
 4    of the State of Maryland, County of Baltimore, do
 5    hereby certify that the within-named witness
 6    personally appeared before me at the time and
 7    place herein set out, and after having been duly
 8    sworn by me, according to law, was examined by
 9    Counsel.
10           I further certify that the examination
11    was recorded stenographically by me and this
12    transcript is a true record of the proceedings.
13           I further certify that I am not of
14    Counsel to any of the parties, nor an employee of
15    Counsel, nor related to any of the parties, nor in
16    any way interested in the outcome of this action.
17    As witness my hand and Notarial Seal this 30th
18    day of December, 2014.
19    _____
       Emily Rose Hoffman
20     Notary Public
21    My commission expires:  August 25, 2015
```