EXHIBIT J

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          IN AND FOR THE EASTERN DISTRICT OF MARYLAND

 3                         CIVIL ACTION

 4

 5   - - - - - - - - - - - - - - - - - - - - - - - -
     RAYMOND GRAY, et al.,           :1:13-cv-02270-WMN
 6                                   :
             Plaintiffs,             :
 7       vs.                         :
                                     :
 8   OFFICER WILLIAM SCOTT KERN,     :
     et al.,                         :
 9           Defendants.             :
     - - - - - - - - - - - - - - - - - - - - - - - -
10

11

12

13         Transcript of deposition of MAJOR ERIC L.

14   RUSSELL, SENIOR taken by and before Mary McKeon,

15   Registered Professional Reporter, Notary Public, at the

16   Rabineau Law Offices, Suite 2252, World Trade Center,

17   401 East Pratt Street, Baltimore, Maryland on Friday,

18   January 16, 2015, commencing at 9:30 a.m.

19

20

21
```

Deposition of Major Eric Russell
Case 1:13-cv-02270-WMN   Document 88-12   Filed 05/20/15   Page 3 of 17
Raymond Gray, et al v. Officer William Scott Kern, et al

Page 2

APPEARANCES:

RABINEAU LAW OFFICES
BY: ALLAN B. RABINEAU, ESQUIRE
Suite 2252
World Trade Center
401 East Pratt Street
Baltimore, Maryland 21202

and

A. DWIGHT PETTIT, P.A. LAW OFFICES
BY: A. DWIGHT PETTIT, ESQUIRE
3606 Liberty Heights Avenue
Baltimore, Maryland 21215
-- co-counsel for the plaintiffs

SCHLACHMAN, BELSKY AND WEINER, P.A.
BY: CHAZ R. BALL, ESQUIRE
Suite 1100
300 East Lombard Street
Baltimore, Maryland 21202
-- for the defendant Officer William Scott Kern

Page 3

APPEARANCES (Continued):

PAUL M. MAYHEW, ESQUIRE
Assistant County Attorney
Baltimore County Office of Law
Room 219
400 Washington Avenue
Towson, Maryland 21204
-- for the defendant Baltimore County

WHITEFORD TAYLOR PRESTON
BY: PATRICK McKEVITT, ESQUIRE
7 Saint Paul Street
Baltimore, Maryland 21202
-- for the defendants Major Eric L. Russell, Senior and Officer Efren E. Edwards, Senior

Page 4

I N D E X

WITNESS                                     PAGE
Major Eric L. Russell, Senior

  by Mr. Rabineau                            5
  by Mr. Mayhew                             36


E X H I B I T S

NUMBER      DESCRIPTION                   MARKED
1           Resume'                          5
2           Color photocopy of photograph  23

Page 5

PROCEEDINGS

Whereupon,

    MAJOR ERIC L. RUSSELL, SENIOR,
having first been duly sworn, was examined and testified as follows:
BY MR. RABINEAU:

    Q  Would you, please, state your full name and address for the record, business address?

    A  Eric Lonnie Russell, Senior. Address is 242 West 29th Street, Baltimore, Maryland, 21211.

    Q  Now, I show you what has been supplied by your attorney, which purports to be your resume'. Is that correct and accurate and up to date?

    A  Yes.

    MR. RABINEAU:  I'm going to mark that.

    (Whereupon, a document was marked Exhibit No. 1, for identification.)

BY MR. RABINEAU:

    Q  Major Russell, has your deposition ever been taken before?

    A  Years and years ago.

Page 6

Q   Well, generally, the rules are, if you don't understand a question, feel free to ask me to restate it.  Or if you need a break for any reason, just say you would like a break.  Or even if you want to speak to your attorney, as far as I'm concerned, you can speak to your attorney.  I don't know if anybody else would have an objection, but I don't.

By the way, one thing I want to add: because I know your position, through your counsel, that you have no personal knowledge of this event directly, through discovery, unlike in court, my questions are not only going to be directed to your personal knowledge, but what you have learned through others, through your command or perhaps witnesses, subject to any objection your attorney might make.

According to this resume', at the time of this Raymond Gray shooting -- you're familiar with that, in February of 2013?

A   Yes.

Q   You were, at that time, the director of education and training for the Baltimore City Police

Page 7

Department; is that correct, sir?

A   Yes.

Q   Now, what do you know, actually, about the event of February 12th, 2013?

A   I know that I was in training and that I received a call there was an incident at an off-site facility of a trainee, officer trainee, being shot during training.

Q   Do you recall who informed you of that?

A   It was via phone call from one of my commanders, I believe.  I was in training, and I got a phone call, and then all the phone calls started coming in.  So, I believe it was John Skinner at the top, Deputy Commissioner John Skinner at the top.

Q   Now, as I understand from your Answers to Interrogatories, you, personally, undertook no investigation regarding this event; is that correct?

A   That is correct.

Q   That fell under the auspices or command of another department; is that also correct?

A   That is correct.

Page 8

Q   Would that have been Internal Affairs?

A   Well, I believe there were various departments investigating it at the time: Office of Internal Insight, Internal Affairs, I believe it was Baltimore County, State Police were all involved at the top.  I don't know how it, basically, branched down to -- became the primary investigator of the entire incident.

Q   Now, this event occurred at a training session at the Rosewood facility; is that correct, to your knowledge?

A   That is correct.

Q   Had you, up till that date, ever been to the Rosewood facility?

A   No.

Q   Have you, since that date?

A   Outside the date of the incident, I have not been back.

Q   You were there the date of the incident?

MR. McKEVITT:  Objection to form.

THE WITNESS:  I was notified of the

Page 9

incident, and then I responded to the location.

BY MR. RABINEAU:

Q   So I understand, your testimony is you were not there when it happened?

A   Correct.

Q   I didn't mean to infer that.  But sometime after the event, you arrived at the Rosewood facility?

A   Yes.

Q   Had Mr. Gray already been transported from the scene?

A   That's correct.

Q   Now I understand you, personally, did not know trainee Gray?

A   Correct.

Q   Are you aware that he was not a member of the Baltimore City Police Department?

A   It was brought to my attention afterwards, yes.

Q   Are you, currently, aware of what -- member of what police department he was at that time?

Page 10

1  A   I believe he was with the University of
2  Maryland Police.
3  Q   What is the arrangement whereby trainees
4  from other police units or departments are trained by
5  the Baltimore City Police Department?
6  A   That's a mutual agreement that's done by
7  upper command, where they would have some mutual
8  understanding of training other departments. And
9  they make the approval, and then they send them to
10 our education and training to be trained.
11 Q   Is that unusual for that to occur?
12 A   No.
13 Q   When that is done, is there any memorandum
14 or agreement of understanding regarding the training?
15 A   Once again, that would be vetted out
16 through upper command.
17 Q   Who would that be, within whose direction?
18 A   At the time this occurred, it would be --
19 at the time, it was the chief -- well, the director
20 of fiscal and the police commissioner, they would
21 make those arrangements of approval or disapproval of

Page 11

1  an outer agency coming in to be trained.
2  Q   I asked it, but I'm not sure if you
3  answered it, but was that reduced to writing,
4  normally?
5  A   I'm not sure.
6  Q   But you do believe it was the chief
7  director of fiscal?
8  A   Fiscal.
9  Q   And who was that at the time, do you know?
10 A   Yes; it was Paul Abel.
11 Q   What was his rank?
12 A   At that particular time, he was then
13 promoted to lieutenant colonel.
14 Q   Do you know if any consideration is paid
15 to have a person trained by the Baltimore City Police
16 Department, any money?
17 A   I don't know in this particular incident.
18 But, yes, they do charge a fee of training, for the
19 training.
20 Q   How much is that fee, do you know?
21 A   No, I don't.

Page 12

1  Q   Now, this training was through the police
2  academy; is that correct?
3  A   That's correct.
4  Q   Is the police academy a brick-and-mortar
5  facility or is it just -- when I say -- is it an
6  actual building, the police academy?
7  A   That's correct.
8  Q   Where is the police academy located?
9  A   3500 Northern Parkway, Baltimore city.
10 Q   Is that near Park Heights Avenue, is that
11 the facility?
12 A   Yes.
13 Q   When a new recruit or trainee comes in,
14 can you tell us how long that training course takes?
15 A   Up to six months, because then you're
16 talking training within the building, you're talking
17 FTO training on the street, you're talking training
18 out at the Sykesville facility in reference to EVOC.
19 So, it could last up to six months.
20 Q   Do you, in your position, have knowledge
21 of what the various courses are that are being taught

Page 13

1  to these trainees?
2  A   I couldn't give you all of them by memory,
3  but I do have them all listed in reference to the
4  schedule that's provided and the classes that are
5  required by the State and required by us for
6  certification, because you're talking firearms
7  training, you're talking law training, you're talking
8  defense tactics, traffic law, criminal law. So, it's
9  various.
10 Q   But it's, generally, a six-month course?
11 A   Yes.
12 Q   How often do new classes come in?
13 A   We try and do, maybe, four a year, try to
14 get four through. It's just based on attrition and
15 based on hiring. And that's done through personnel;
16 they get the recruits together to formulate a class.
17 Q   Do you know on the day this occurred,
18 which I believe was February the 12th, 2013, what
19 type of training was being conducted at the Rosewood
20 facility?
21 A   No.

Page 14

Q  What is tactical training?
A  It's like defense training in reference to dealing with situations involving firearms, hand-to-hand, self-defense-type training.
Q  What is bunker training?
A  In laymen's terms, basically trained to use a shield to be provided between you and an individual or a situation.
And that's provided through education and training in our tactical division, SWAT, to be used on -- using the shield for cover.
Q  With regard to let's call it tactical training in general, what training does the actual trainer have instructing the class?
A  They go through the trainer-type training, and then they're certified to train in that particular field.
Q  Is there a manual that goes along with it, a printed manual?
A  I believe so, but I'm not sure.
Q  Now, with regard to specifically, let's

Page 15

say bunker training, is there any printed material, part of a manual, which indicates the rules and regulations and subject matter for bunker training?
A  That's something our tactical unit would have for their training in, like, their lesson plan in reference to what they're teaching.
Q  Let's assume that you wanted to get ahold of that written material. You said from tactical?
A  Yes.
Q  Let's assume it exists. What would you request if you would call over there, that you would want what?
A  Give me the training manual on tactical -- bunker training.
Q  The technical term of art would be the "training manual?"
A  Yeah.
Q  Assuming that it exists. Would any of that be covered under general orders, or is that more specific?
A  It could be under, like, an SOP, standard

Page 16

operating procedure, for that particular unit who provided the training.
Q  As far as the training, as I understand it, you train at the academy the recruits, trainees, but then also there has to be a recertification on a yearly basis; is that correct?
A  That's correct.
Q  And does that recertification apply to trainers as well?
A  Yes. They have an expiration date on their training credentials where eventually, they have to be retrained. But we do yearly training for certification for the officers.
Q  Do you know what training a trainer would have with regard to bunker training?
A  (No response).
Q  Let me be more specific, since you don't seem to follow. Number one, would it be on a yearly basis or some other period of time? Would it be within the department or would the training occur through some outside instructor?

Page 17

A  I'm not particularly sure. Tactical would handle that portion in reference to certification and retraining.
Q  Well, as director of education and training, do you have any input into any of the materials that are used for training purposes?
A  Input in reference to what's being trained, I wouldn't, per se, change the training that's in place, but I ensure that it's being done by certified instructors.
Q  How would that differ, your area of expertise and duties, from the tactical division's area of expertise and duties?
A  I would say -- because with tactical, they obtain additional training in tactical-type incidents and things of that nature where they will come in and train the officers. So, it's more of an expertise thing for them in the tactical situation.
We kind of ensure the officers get every piece of training. So, we have special officers come in to, like, teach traffic from the traffic division;

Page 18

1  that's the expertise they're qualified to train. They
2  come in and they provide the training as well.
3      Q   As a result of this Raymond Gray incident,
4  are you aware of any changes that have been made in
5  bunker training?
6      A   No. Not me, no.
7      Q   I mean either -- not only personally, but
8  through what you've heard or read?
9      A   I haven't been part of it since the
10 incident. No, I don't know.
11     Q   Other than training of recertification and
12 recruits, is there any other training that falls
13 within your department?
14     A   Well, we may provide additional training
15 where we may have instructors come into each other's
16 classes just to enhance an officer's training in
17 different areas. We may invite trainers for specific
18 things to come in and train as well.
19     Q   Now, I'm reviewing -- and I guess to
20 direct you, I'm now referring to Exhibit Number 1.
21 And under your career history, under director of

Page 19

1  education and training, right in the first paragraph,
2  you refer to the fact that one of your
3  responsibilities is reviewing and evaluating policies
4  and program delivery and ensure its compliance with
5  established criteria.
6          In regard to those duties, did you have any
7  review or evaluation of any of the training procedures
8  in the bunker program? If you understand the question?
9      A   I can't recall. I can't recall. If I can
10 elaborate, I guess? I've been there for six months,
11 education and training. And I was -- you know, I
12 continue to orient myself with all aspects of the
13 training. So, I can't remember if I had a detailed
14 review of the bunker training.
15     Q   Who was your predecessor?
16     A   Who did I relieve? I believe when I was
17 assigned, that it was -- there was a vacancy there,
18 and I think I was moved there to fill the vacancy.
19 Yes, there was a vacancy, and director John King was
20 there before I arrived.
21     Q   What was his rank?

Page 20

1      A   Director. He was a civilian at the time.
2      Q   A civilian director?
3      A   Yes.
4      Q   Now, you limited the answer to the
5  question for the period prior to this incident in
6  2013.
7          But since that time, have you reviewed and
8  evaluated any of the policies and program deliveries
9  regarding bunker training?
10     A   No.
11     Q   Below that, under the first dot, where it
12 starts with the word assessing existing training
13 programs -- and I guess we've covered that already --
14 and consulting in the selection and training of
15 department instructors, have you had any role in the
16 selection or did you have any role in the selection
17 and training of department instructors at the time of
18 this incident?
19     A   No. All instructors were in place when I
20 arrived.
21     Q   Then if you go down to your third dot, the

Page 21

1  second sentence, verifying compliance and
2  effectiveness of all training programs, what role
3  have you played in verifying compliance and
4  effectiveness of training programs with respect to
5  the bunker training?
6      A   Okay. So in reference to the training,
7  what happened, what I had done was -- the MPTC,
8  Maryland Police Training Commission, they came in and
9  did an audit of our police trainee training and also
10 our in-service training.
11         And they did an audit and said -- you know,
12 provided that we were in compliance with all training
13 requirements for the police training commission.
14         So, once we provided all that and they
15 reviewed it and said we were in compliance, all our
16 trainers are in compliance to continue in training. In
17 reference to specific bunker, I can't say I recall
18 drilling down that deep right now.
19     Q   Are you familiar with what type of weapon
20 is used in bunker training?
21     A   Type of weapon?

Page 22

Q   Simunition; are you familiar with the simunition that's used in bunker training?
A   Yes.
Q   Are you familiar with the rules and regulations with regard to having a live weapon in a training area?
A   There's not to be one.
Q   That is a hard-and-fast rule?
A   Yes.
Q   Any exceptions under that at all?
A   Not that I'm aware of.
Q   Now, the simunition that was used at the time by Baltimore City Police Department, can you identify what type of weapon that was, what type of simunition that was?
A   In specifics, no.  In laymen's terms, the weapon is a blue-colored weapon; it's purposely colored for training.  It resembles the weapon that we carry, a Glock .22.
Q   I'm going to make it easy for you.
A   Thank you.

Page 23

Q   Is this a fair and accurate representation?
A   Thank you, yes.
    (Whereupon, a document was marked Exhibit No. 2, for identification.)
BY MR. RABINEAU:
Q   Now, I'm showing you Exhibit 2.  And is that a fair and accurate representation of a simunition used by the Baltimore City Police Department at the time of this incident?
A   Yes.
Q   And the live weapon that is police-issued, is that a Glock .22?
A   Correct.
Q   Now, someone has mentioned that this could be called a Glock T .22.  Would you have any --
A   I wouldn't have any objections if they're talking about this particular weapon.
Q   And the difference is that this is blue, as opposed to all-black for the Glock .22; is that correct?

Page 24

A   That's correct.
Q   It's been described in testimony as a gun which has a blue handle.  And I'm only asking you, this picture, which you've described as a fair and accurate representation, shows much more than just the handle being blue; is that correct?
    MR. McKEVITT:  Objection to form.
    You can answer it.
    THE WITNESS:  If someone says the handle was blue, I would agree to that.
BY MR. RABINEAU:
Q   But also, is this called a "trigger guard?"
A   The trigger guard is blue.
Q   The barrel, underbarrel is blue?
A   That's correct.
Q   And actually, when the magazine is placed into this simunition, the bottom would appear to be blue, also; is that correct?
A   That's correct.
Q   So the only thing, in effect, that is not

Page 25

blue --
A   Is the slide and the barrel.
Q   The slide.  Have you handled one of these simunitions?
A   No, I have not.
Q   So, you've never taught bunker training, I take it?
A   That's correct.
Q   Now, have you testified in any proceedings regarding this incident?
A   Testified?  No, no.
Q   According to your Answers to Interrogatories, you have not taken part in any investigation regarding this Gray incident, correct?
A   I was interviewed by Internal Affairs as a witness to this.
Q   So, that would be your only involvement as far as investigation, when you were interviewed?
A   That's correct.
Q   And that was a statement you gave to Sergeant Keith Jones and Lieutenant Alonso Moreland

Page 26

1  from the Internal Affairs division?
2  A   That's correct.
3  Q   What did you indicate in your statement to
4  them?
5  A   Of course, they had a series of questions.
6  But it boiled down to me telling them that during
7  this incident, I was at training at another facility
8  and that I had put subordinates in place to fill in
9  until I returned from training.
10 Q   Now, you mentioned you were at training?
11 A   Correct.
12 Q   Were you training someone or were you
13 being trained?
14 A   I was being trained.
15 Q   What was the subject matter of your
16 training?
17 A   International Association of Chief of
18 Police, IACP, Training for Leadership. I was at that
19 training.
20 Q   Who did you put in charge in your absence?
21 A   So, I was going to be gone for a whole

Page 27

1  week. So, I had two lieutenants who were going to be
2  in charge while I was absent. The first day, which
3  was Monday, there was Lieutenant Donald Gerkin. The
4  second day was when the incident occurred, was
5  Lieutenant Troy Walton.
6  Q   Do you know a Sergeant Snead?
7  A   Yes.
8  Q   Is he within your department, Sergeant
9  Snead?
10 A   Within the police department?
11 Q   No, no. Within your division?
12 A   No.
13 Q   Do you know what division he's within?
14 A   He was in the police commissioner's
15 protection unit.
16 Q   Now, under normal circumstances, if you
17 would have been on duty, would you have been aware
18 that there was a training program going on at
19 Rosewood on those two days?
20 A   I don't know. If someone were to tell me
21 that's where they were going to training, then I

Page 28

1  would assess it. But I don't know how that came into
2  fruition.
3  Q   You did not know in advance they were
4  going to be training there those two days?
5  A   Right.
6  Q   I guess what I'm getting at, do you get a
7  schedule of some type showing what -- on a daily
8  basis or a weekly basis what training these classes
9  are going to be -- where they're going to be held and
10 what they're going to be trained on?
11 A   So there's a training schedule for the
12 class in reference to what they're doing, and it's,
13 basically, mapped out for their whole time in
14 training.
15     What I then do is I provide myself with a
16 calendar on a weekly basis to know where each class is
17 going to be for the week.
18     During that particular week, they were in
19 training. But I was out of the office, so I wasn't
20 provided where the training was going to be held.
21 Q   Were you there the week before?

Page 29

1  A   Yes, I believe so.
2  Q   This weekly schedule, did that have a name
3  other than, "weekly schedule?"
4  A   No. It was my schedule. I didn't
5  label -- I don't think I labeled anything official.
6  It was just my personal-type calendar for the week.
7  Q   Did you keep those?
8  A   Yes.
9  Q   Do you still have a copy of it for that
10 week you were not there?
11 A   Yes, I believe so, and I believe I
12 provided my counsel with it.
13     MR. McKEVITT: That was the schedule that
14 was provided.
15     MR. RABINEAU: That was his schedule?
16     MR. McKEVITT: Yes.
17     MR. RABINEAU: The schedule I'm talking
18 about is the schedule for the class.
19 BY MR. RABINEAU:
20 Q   Before I ask you that, are these classes
21 designated in some way, so we can differentiate

Page 30

1  between classes?
2  A  On my calendar?
3  Q  No. Let's say this class --
4  A  Yes.
5  Q  -- Raymond Gray was in, would it have a
6  certain designation?
7  A  Yes. I don't recall what -- the exact
8  number. But, say -- for instance, he would be 1301.
9  But, like I said, I don't know the exact number.
10     But that's how we differentiate the classes,
11 by year, then the number of class. So, that would be
12 year 2013, first class. Second class would be 201302,
13 if you get what I'm saying.
14 Q  Exactly. It's pretty clear. You had
15 referenced it the first time as "13." Do you say
16 "13" or "2013?"
17 A  Thirteen. You can say, "2013," but we
18 know "13" means the year.
19 Q  You started to tell me, and I think I
20 interrupted you, regarding the content of your
21 statement. Had you completed the statement?

Page 31

1  A  Yes.
2  Q  The statement to Sergeant Jones and
3  Captain Moreland, then Lieutenant Moreland, what else
4  did you tell them?
5  A  Like I mentioned, where I was at when it
6  occurred, who I left in place while I was out of the
7  office, and I had no knowledge of the training
8  facility.
9  Q  At the time they interviewed you, had you
10 already been out to Rosewood?
11 A  The interview happened after the incident.
12 Q  So, you had already been to Rosewood?
13 A  Yes.
14 Q  Did they ask you anything about the
15 observations you made at Rosewood?
16 A  No.
17 Q  Did you make any observation when you were
18 at Rosewood regarding what you would say -- the
19 safety of the place for such training?
20 A  Could you narrow down what you mean by,
21 "the safety of the place?"

Page 32

1  Q  Well, if you felt it was a safe
2  environment in which to hold a training of this
3  nature?
4  A  At that particular time, looking at it,
5  no, I wasn't observing to see whether or not it was a
6  safe area to conduct training or not.
7  Q  Do you have any opinion regarding that?
8  A  My opinion?
9  Q  Yes.
10 A  From what I remember of the place, it's a
11 building with approval that we would use for
12 training.
13 Q  Did you feel it was a secure area?
14 A  In my opinion, I think the place was, yes,
15 secure enough to be used for training.
16 Q  In fact, you had to go through a
17 checkpoint or a gatehouse that was manned to get in,
18 do you recall that?
19 A  I believe so.
20 Q  If you don't --
21 A  I believe so, yes. Yes.

Page 33

1  Q  Since the date of this incident, to your
2  knowledge, has Rosewood ever been used again for
3  training purposes?
4  A  I don't know one way or the other. I
5  don't know.
6  Q  Were you ever asked to make a
7  determination or add your opinion with regard to
8  whether or not this should continue to be used for
9  training?
10 A  No.
11 Q  Do you know a Rosemary Lambert?
12 A  No.
13 Q  Are you familiar with the name "2916
14 Protective Guard Services?"
15 A  No.
16 Q  Do you know a William Thomas Jackson?
17 A  No.
18 Q  In a bunker training situation, do you
19 know if a safety officer is required to be present?
20 If you don't know, that's a valid answer. If you
21 don't know, you don't know.

Page 34

1  A  In general? I don't know.
2  Q  At the time this occurred, did you know
3  either Officer Gray or Officer Edwards?
4  A  I knew Officer Edwards. Not Officer Gray.
5  Q  Have you ever discussed this matter, what
6  happened to Mr. Gray, with Officer Edwards?
7  A  No.
8  Q  Do you know Sergeant Darrell Jackson?
9  A  Yes.
10 Q  What division is he in?
11 A  He worked for ENT, as well, but he was in
12 charge of the EVOC training; that would be our
13 driving training. And he was in charge -- he had
14 officers, his subordinates, as well.
15 Q  Is he on a supervisory level?
16 A  Yes, he is. Sergeant Darrell Jackson,
17 yes.
18 Q  Do you know if either Officer Kern or
19 Edwards would have been under his command?
20 A  Officer Kern would be under his command.
21 Officer Edwards, no.

Page 35

1  Q  Why the distinction between the two?
2  A  Okay. So, the reason I guess you're
3  getting at, those two being together at that
4  particular date?
5  Q  Yes.
6  A  So, they're certified trained in firearms
7  and certified trained in providing simunitions
8  training.
9     So those two individuals, being certified,
10 are brought together to provide the training for that
11 particular day. Then once the training is over, they
12 go back to their respective groups. Efren Edwards does
13 the PT, physical training. Officer Kern does the EVOC
14 driving training.
15 Q  But also Officer -- they were both doing
16 the bunker training, though, on this day?
17 A  Correct. That's specialized training that
18 they have.
19    MR. RABINEAU: I may be finished. But, may
20 we have a brief break?
21    (Brief recess.)

Page 36

1     MR. RABINEAU: Witness with you.
2  BY MR. MAYHEW:
3  Q  Major Russell, my name is Paul Mayhew. I
4  represent Baltimore County in this matter.
5     To your knowledge, and I'm going to include
6  what Mr. Rabineau went over with you, not only your
7  personal knowledge, but anything you've heard, any
8  document you've seen, within that whole universe of
9  knowledge, do you have any reason to believe any
10 officer or employee of any kind from Baltimore County
11 was at the scene of this incident prior to the
12 investigation?
13 A  No.
14 Q  You testified briefly earlier that you
15 believe Baltimore County may have responded and
16 played some part in the investigation of this.
17 A  The investigation portion, yes.
18 Q  After the fact?
19 A  After the fact.
20    MR. MAYHEW: That's all I have.
21    MR. BELL: I don't have anything. Thank you.

Page 37

1     MR. McKEVITT: Okay. We'll read and sign.
2     (Whereupon, at 10:08 a.m., the deposition was
3  concluded.)

Page 38

# CERTIFICATE OF DEPONENT

I hereby certify I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections I feel are necessary I will attach on a separate sheet of paper to the original transcript.

———————————————
Major Eric L. Russell, Senior

Page 39

# C E R T I F I C A T I O N

I, Mary McKeon, Registered Professional Reporter and Notary Public for the State of Maryland, do hereby certify I stenographically reported the foregoing proceedings on the date and time indicated after the witness was duly sworn by me.

I, further, certify I am not an employee of nor related to nor acquainted with any of the parties to this action and am not financially or otherwise interested in the event of such action.

———————————————
Mary McKeon, RPR

Eric L. Russell
(Phone) 443-721-7660
5421 Biddison Ave. Baltimore, Maryland 21206
Email: eric.russell@baltimorepolice.org

## PERSONAL SUMMARY

Well presented, highly personable individual with a keen sense of justice and drive to enforce the law and provide reassurance to the public. A hardworking, pro-active and experienced police officer with an upbeat and positive attitude, who possesses a good team spirit and the ability to see a job through until it is completed. Highly motivated and able to exercise independent judgment in achieving the vision and mission of the Baltimore City Police Department.

## CAREER HISTORY

**Major –Director of Education and Training**  *Present*

Responsible include the following; reviewing and evaluating policies and program delivery and ensuring compliance with established criteria and effectiveness of instruction for all departments sponsored training programs.

- Assessing existing training programs, reviewing criteria for implementing new training programs and consulting in the selection and training of department instructors.
- Assisting in policy development for academic training, facilitating the continuity and relevance of all academic training programs; as well as designing general methods of evaluating the effectiveness of training in the field.
- Formulating recommendations for improvement in short and long term retention of instruction, verifying compliance and effectiveness of all training programs and approaches; identifying training problem areas and recommending modifications, advising management on problems related to police training and program administration.
- Researching methods to improve instructional and learning process, formulating strategies to aid instructors in training methods and content of instruction
- Advising department of current developments in educational methodology applicable to police training and assessing management on training related contacts with outside organizations; as well as participate on various committees as assigned.

Eric L. Russell
(Phone) 443-721-7660
5421 Biddison Ave. Baltimore, Maryland 21206
Email: eric.russell@baltimorepolice.org

**Major- District Commander of the SWD**  *2010- 2012*

Responsibilities include the following: overseeing and directing the activities of patrol officers within geographic area, coordinating detectives' investigative efforts within Baltimore City.

- Exercising functional supervision over officers engaged in traffic enforcement functions; as well as maintains contact with civic leaders and community groups within the geographic bureaus to promote the goals and missions of the police department to encourage neighborhood watch safety program and to generate input from citizens to establish mutual trust between police officers and the community.
- Responsible for ensuring compliance with department policies and procedures by personnel under supervision, conducting audits of operations and making recommendations to higher management for improving productivity and increasing efficiency.
- May act as a Chief's Duty Officer during off hours or a Deputy Chief in his/her absence and carry out assigned duties and responsibilities.

**Deputy Major- Manage the Central District**  *2009-2010*

Responsibilities include: supervision and enforcement of all rules, regulations, general orders and policies and procedures of the Baltimore City Police Department. In the absence of the Police Chief, the Deputy Major assumes command and control of police operations, including duties as a department spokesperson when required.

- Assist the Police Chief with managing and directing all aspects of the day to day promotion, policy development, counseling, discipline, and litigation and termination recommendations.
- Provides daily reports to the Police Chief on department events as they develop.
- Reviews and approves all requests for training and travel by department personnel; completes and approves all supervisors' event reports as forwarded through the chain of command and approves all drug fund purchases.
- Supervises and coordinates all investigations relating to criminal activities and bureau personnel; coordinates law enforcement activities with other law enforcement agencies and when necessary directs field efforts.

Eric L. Russell
(Phone) 443-721-7660
5421 Biddison Ave. Baltimore, Maryland 21206
Email: eric.russell@baltimorepolice.org

**Patrol Lieutenant- Shift Commander SWD Midnight Shift**                    *2008- 2009*

Served as station commander; supervises subordinates supervisors, performs staff assignments and in absence of the Police Chief and Captain, assumes command of the police department. Essential duties and responsibilities included but were not limited to the following:

- Performing a variety of management and administrative duties ranging from commanding a police division through leading police patrol teams in the performance of law enforcement services.

- Researching, planning, organizing, staffing, evaluating and budgeting police programs, traffic and fleet management; as well as firearm training management, canine bureau management, evidence management, field evidence technicians and community service officers.

- Planned personnel scheduling and training, internal investigations, disaster preparedness and personnel and recruitment.

- Prepared presentation of the annual department budget, and along with presenting to the Police Chief recommendations for improving the quality of police services.

<u>Sergeant</u>

**Patrol Police Sergeant – Supervisor of the Western District Sector 1**           *2005- 2007*

**Operations Police Sergeant- Supervisor of the Western District Flex Team "A"**    *2003-2004*

**Patrol Police Sergeant – Supervisor of the Western District Midnight Shift Sector 3**   *2002-2003*

With moderate supervisions, the incumbent receives moderate supervision from technical superior. The position requires planning and coordinating the work of police officers, providing supervision of police personnel.

- Confers frequently with subordinates and superiors on crime patterns, progress of investigations and new departmental orders.

- Reviewed and gives preliminary approval to all reports written by subordinates, disciplines and evaluates subordinates.
- Initially deploys personnel and sets up command post at scenes of robberies, homicides and fires. Reviews work of subordinate officers, including all reports, citations; ensures the accuracy, completeness and legality of all police operations and paperwork during a shift.

Eric L. Russell
(Phone) 443-721-7660
5421 Biddison Ave. Baltimore, Maryland 21206
Email: eric.russell@baltimorepolice.org

## Detective

| | |
|---|---|
| **Detective Police Sergeant – Supervisor Internal Investigation Division Area 1** | *2007-2008* |
| **Detective Police Sergeant – Supervisor of the Western District Sector 1** | *2004-2005* |
| **Detective Police Sergeant – Supervisor of the Western Drug Unit** | *2003- 2004* |
| **Police Detective W.A.T.F – Investigate and locate wanted individuals in Baltimore City** | *2000-2002* |

Conducts investigations, obtain information through personal interviews, gathers and preserves evidence, detains and arrest persons for probable cause and on the basis of applicable laws and departmental policy. Participate in raids and surveillance, searches.

- Examine crime scenes to obtain clues and evidence, such as loose hairs, fibers clothing or weapons; secure deceased bodies and obtain evidence from it, preventing bystanders from tampering with it prior to medical examiner's arrival, and obtain evidence from suspects.

- Prepare charges or responses to charges, or information for court cases according to formalized procedures; provide testimony in court cases when requested.

- Analyze completed police reports to determine what additional information and investigative work is needed.

- Prepare charges or responses to charges or information for court cases according to formalized procedures; serves arrest warrants and summonses; testifies in court when necessary.

## Police Officer

**Police Officer- Assigned to motorized patrol shift in the Eastern District**   *1992-2000*

Patrolled assigned post by motor vehicle to prevent and discover the commission of crime maintain order and protect life and property applying sound judgment in accordance with state and local laws and Baltimore Police Department rules and procedures.

- Responded to calls and complaints, evaluated situations and determined appropriate course of action in accordance with laws and departmental polices.

- Identified hazardous situation and persons or vehicles wanted for criminal violations and notified appropriate authorities of condition needing attention.

- Maintained order and intervened in fights, pursued, subdued and disarmed suspects; protected crime scenes, arrest suspects, administered first aid, enforced crowd control and responded to emergency situation without delay.
- Participated in community policing, interacted with resident residing and working in patrol are; establishing rapport with community to facilitate cooperation in solving problems and exchanging information.

Eric L. Russell
((Phone) 443-721-7660
5421 Biddison Ave. Baltimore, Maryland 21206
Email: eric.russell@baltimorepolice.org

## Education

| | |
|---|---|
| University of Baltimore<br>Bachelor of Science in Forensic Studies | *Baltimore, MD*<br>*2003-2005* |
| Baltimore City Community College<br>Associates of Applied Science in Criminal Justice | *Baltimore, MD*<br>*2001-2003* |

## Distinctions

| | |
|---|---|
| District Commissioner for the Explorers Program | Present |
| Department's liaison for the Boy Scouts of America | Present |
| Lieutenant Promotional Exam: Subject Matter Expert | *2011* |
| Maryland Police and Correctional Training Commission, Certificate of Merit | *2010* |
| Executive Development Leadership Challenge XIX | 2010 |
| UMUC Leadership Certification | *2009* |
| National Deans List | *2003* |
| Wilson Scholarship Award | *2003* |

Page 16