IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAYMOND GRAY <u>et al.</u>          *
                                    *
v.                                  *
                                    *     Civil Action No. WMN-13-2270
OFC WILLIAM SCOTT KERN <u>et al.</u> *
                                    *
    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *


**<u>MEMORANDUM</u>**

Before the Court is a Motion for Summary Judgment, ECF No. 78, filed by Defendant Officer William Scott Kern and a Motion for Summary Judgment filed by Defendants Officer Efren Edwards and Major Eric Russell.  ECF No. 86.  The motions are ripe. Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and Officer Kern's Motion will be granted in part and denied in part, and Major Russell and Officer Edwards' Motion will be granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a well-publicized shooting incident that occurred during a police training exercise in Baltimore County, Maryland.[1]  Raymond Gray, a University of Maryland Police trainee, attended a February 12, 2013, training exercise held at

---

[1] The factual assertions relied upon in support of, and in opposition to, the motions before the Court include testimony recorded in a related criminal proceeding.

the Rosewood facility in Baltimore County.  The training was conducted by the Baltimore Police Department (BPD) for trainees of the BPD, Baltimore City Sheriff's Office, and University of Maryland Police.  At the time of the incident, Major Russell was the Director of Education and Training who oversaw the recruit program in which Mr. Gray was participating.  Normally apprised of daily training and locations, Major Russell was out of the office for his own training on the day in question and was not aware of the exercise or that it was to be held at the Rosewood facility.

The goal of the training – conducted by Officers Kern and Edwards in their capacity as Safety Officers – was to teach handling of police shields, known as bunkers, through replication of real-life scenarios using simulation firearms. The simulation firearm – or simunition – used in this training was a pistol that was meant to re-create the feel and operation of a standard-issue Glock .22, was marked with a blue handle, and fired non-lethal ammunition.  Nonetheless, because simunition ammunition is capable of causing bodily injury, as a matter of policy, any participant in training involving simunition weapons is required to wear protective gear around the groin, throat, head, and hands in addition to the standard-issue service vest.

While simunition weapons were in use during training, live weapons were prohibited from the training site.  Despite this prohibition, Officer Kern and Officer Edwards discussed in advance that each were to take turns carrying an unloaded service weapon.[2]  It was decided that Officer Kern should keep his service weapon with him on the first day of training.  In the morning when he arrived at Rosewood, Officer Edwards unloaded his weapon, placed the ammunition in his car's glove box, placed his weapon in a locked black bag, and locked the black bag in the trunk of his car.  Officer Kern chose to keep his live weapon on his person, feeling that the Rosewood site was not a "secure facility."  Officer Edwards asked if Officer Kern conducted a safety check on the weapon before bringing it into the facility, and Officer Kern replied in the affirmative. After running an errand off campus during lunch, Officer Edwards returned his live weapon to his car using the same procedure. At that time, he again asked Officer Kern if he conducted a safety check, as Officer Kern continued to carry his live weapon.  Officer Kern again replied in the affirmative.

Officer Kern stored his live weapon in an off-duty holster around his waist and placed the simunitions weapon in his

_____

[2] Whether this conversation occurred is disputed by Officer Edwards.  The Court, however, for the purposes of this motion, accepts the facts in the light most favorable to Plaintiffs, as the non-moving party.

pocket.  Both the live weapon and the simunitions weapon were kept on Officer Kern's dominant right hand side.  Officer Kern unholstered his live weapon twice during the training before the incident in question.  He first demonstrated how an officer knows that his service weapon is empty of ammunition, in response to a trainee question.  Then, in the afternoon, he used his live weapon to demonstrate how to load a weapon with one hand while holding a bunker.  A trainee pointed out to Officer Kern that he was using his live weapon and not the simunitions weapon.  Officer Kern apologized and said that he grabbed the live weapon from "muscle memory."

After lunch, Officer Kern was conducting bunker training with three trainees inside a gymnasium.  Mr. Gray stood with other trainees in a hallway outside the gymnasium while waiting to take a turn in the training exercise lead by Officer Kern. The gymnasium and the hallway were separated by a closed door. The closed door was wooden and had a window through which Officer Kern could see Mr. Gray and the other trainees milling about while they waited.  The site of the idling trainees reminded Officer Kern of the danger of "fatal funnels," or doorways, hallways, stairways, and windows that can present a unique risk of attack to police officers.

Although the concept of "fatal funnels" was not an element of that day's bunker training,[3] Officer Kern decided that the trainees awaiting their turn needed to be reminded of the danger of "fatal funnels."  Officer Kern determined that a shot from his simunitions weapon at the closed door would alert the trainees that they were near a potential "fatal funnel" and would remind them that they should "stay out of [fatal funnels], don't congregate, don't talk to people in those because typically throughout the country police work [sic], those are the biggest areas that police get killed in."  Kern Trial

---

[3] In the words of Officer Kern, bunker drills consisted of the following:

> Initially starting with one person behind the bunker moving with the bunker forward, backward, side to side, teaching them to maintain a crouched position, covering all the areas they need to.  From that, we move to a single person moving forward, side to side, back and then forward again with the bunker and then taking a knee and putting rounds into a target on the wall.  From there, we graduate up to a bunker person and a cover person behind them, teaching them how to react to making contact with a, an individual where the bunker man goes down to a knee, covers, the point man comes over top, how to safely transfer the weapon, transition the weapon over the top of the bunker, making sure that the weapon is in front of the bunker, not behind the bunker and then they're the one that issue the verbal commands and then they walk through that and . . . they actually do a shoot, shooting with the targets.

Kern Trial Testimony, ECF No. 78-3, 29:6-22.

Testimony, ECF No. 78-3, 30:24-31:2.  Without checking the color of the weapon handle, he pulled a weapon and aimed it at the window of the door.

Officer Kern fired the weapon.  Upon firing, Officer Kern realized that he had discharged his live weapon and not the simunitions weapon.  The bullet from his live weapon traveled through the glass window of the door[4] and struck Mr. Gray in the head, causing serious injury.  Officer Kern ran into the hallway, where other recruits told him that he shot Mr. Gray. Officer Kern ran to Officer Edwards to tell him that he shot Mr. Gray and then called 9-1-1.

Mr. Gray, joined by his wife Sheri Gray, subsequently filed a Complaint in the Circuit Court for Baltimore City on June 14, 2013, against Officer Kern, Major Russell, Officer Edwards, BPD Commissioner Anthony Batts, the BPD, the Mayor and City Council of Baltimore City, Baltimore County, and the Baltimore County

---

[4] Officer Kern includes in his statement of facts that "a simunition round would not have penetrated the wooden door and would not have caused harm to any trainee" based on the testimony of his expert during his criminal trial.  ECF No. 78-1 at 5.  Officer Kern further states that it could be inferred from the expert testimony that a simunition round also could not have penetrated the window.  The cited testimony makes no mention of a window, discussing the likelihood of a simunition round going through the door only.

Police Department.[5]  Defendants moved to this Court on August 5,

2013.  Plaintiffs filed an Amended Complaint on May 27, 2014,

alleging: False Imprisonment (Count I), Violation of Maryland

Constitutional Rights (Count II), Battery (Count III), Assault

(Count IV), Intentional Infliction of Emotional Distress (Count

V), Gross Negligence (Count VI), Negligence (Count VII),

Excessive Force (Count VIII), Deprivation of Federal Rights

(Count IX), and Loss of Consortium (Count XI).[6]

## II. LEGAL STANDARDS

Summary judgment is appropriate if the record before the

court "shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 377 U.S. 317,

322-23 (1986).  A fact is material if it might "affect the

outcome of the suit under the governing law."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining

whether there is a genuine issue of material fact, the Court

"views all facts, and all reasonable inferences to be drawn from

them, in the light most favorable to the non-moving party."

---

[5] All Baltimore County entities and the Mayor and City Council of
Baltimore City have been dismissed from the case.  The Court
granted BPD and Commissioner Batts' motion to bifurcate.  See
ECF No. 56.

[6] Count X is a 42 U.S.C. § 1983 claim brought pursuant to Monell
v. Dep't of Soc. Svcs., 436 U.S. 568 (1978), against the BPD for
failure to train.

Housley v. Holquist, 879 F. Supp. 2d 472, 479 (D. Md. 2011)

(citing Pulliam Inv. Co. v. Cameo Prop., 810 F.2d 1282, 1286

(4th Cir. 1987)).

## III. DISCUSSION

### A. Officer Kern's Motion for Summary Judgment

#### a. Plaintiffs' Claims of Negligence and Gross Negligence

##### i. Negligence

Plaintiffs bring claims that sound in negligence, (Count

VII) and gross negligence (Count VI).  As to the negligence

claim, Officer Kern asserts that as a public official acting in

a discretionary capacity, he is immune from claims of

negligence.  Further, as to gross negligence, Officer Kern

reasserts that his conduct was not so reckless as to rise to

liability.  Plaintiffs counter that not only was Officer Kern

acting recklessly to rise to the level of gross negligence, he

acted with malice such that he is not protected from their

negligence claim by the doctrine of sovereign immunity.  In the

alternative, Plaintiffs argue that immunity does not apply as

Officer Kern had a special relationship to Mr. Gray.

Officer Kern claims immunity from judgment on Plaintiffs'

claim of negligence under a common law theory of public official

immunity.  In order for public official immunity to apply, "the

following independent factors must simultaneously exist: (1) the

individual actor . . . is a public official rather than a mere

government employee or agent; and (2) his tortious conduct
occurred while he was performing discretionary, as opposed to
ministerial, acts in furtherance of his official duties. . . .
[I]n the absence of malice, the individual involved is free from
liability." James v. Prince Georges Cnty., 418 A.2d 1173, 1178
(Md. 1980).  The Court of Appeals of Maryland has held that
police officers are public officials.  Houghton v. Forrest, 989
A.2d 223, 227 (Md. 2010).  By failing to rebut Officer Kern's
argument as to the second factor, Plaintiffs essentially concede
that Officer Kern was engaged in a discretionary, as opposed to
ministerial, function when he engaged in the allegedly negligent
acts.  ECF No. 79-1 at 21 ("Defendant's argument 'a,' that
Defendant Kern is a public official and 'b' Defendant Kern's
actions at the training session are ministerial, are
irrelevant.").  Therefore, both criteria set forth in James are
considered met and Officer Kern falls within the class of
employees who enjoy common law immunity in the absence of malice
or a special relationship.

Common law public official immunity, however, is not
inviolable.  Plaintiffs make two arguments to defeat Officer
Kern's immunity: that Office Kern acted with malice and that a
special relationship existed between Officer Kern and Mr. Gray.
Immunity will not be available to a public official if he acted
with actual malice.  Thomas v. City of Annapolis, 688 A.2d 448,

454 (Md. Ct. Spec. App. 1997) ("This court, when holding public official immunity to be applicable, has defined malice as 'actual malice.'").  "'[Actual] malice is established by proof that the defendant-officer "intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff."'"  Bord v. Baltimore Cnty., 104 A.3d 948, 964 (Md. Ct. Spec. App. 2014) (citation omitted).  It is the burden of Plaintiffs to meet a "clear and convincing" standard to prove actual malice, as opposed to the "preponderance of the evidence" standard usually required in a civil case.  Darcars Motors of Silver Spring, Inc. v. Borzym, 841 A.2d 828, 841 (Md. 2004) ("[A] judge must not allow the jury to consider the issue of 'actual malice' unless the evidence could establish 'actual malice' clearly and convincingly.").

The Plaintiffs argue that the factual record supports a conclusion that Officer Kern's conduct rises to the level of actual malice.  Particularly, Plaintiffs point to Officer Kern's duplicitous affirmative answers when Officer Edwards asked throughout the day if he conducted a safety check as well as Officer Kern's reluctance to hand over his weapon after the shooting.  ECF 79-1 at 22.  While this evidence points to Officer Kern's reckless disregard for safety and lack of excuse

10

or legal justification in engaging in the conduct under review, it does not give rise to the inference of "evil" conduct propelled by a "rancorous motive."  See Shoemaker v. Smith, 725 A.2d 549, 560 (Md. 1999) (stating, during overview of Maryland case law on malice, that mere gross negligence or wanton or reckless conduct falls under the category of "implied malice" rather than "actual malice").  Even if the jury were to consider the facts that underpin Plaintiffs' conclusion that "[Officer] Kern was racially biased against African Americans," ECF No. 79-1 at 8, a juror could not conclude even under the lower "preponderance of the evidence" standard that Officer Kern was motivated by hate.  Plaintiffs point to the existence of an EEOC complaint against Officer Kern and Officer Edwards' speculation that Officer Kern's actions were racially biased.  This opinion is based on Officer Kern's dislike of President Obama and Officer Edwards' general observation that Officer Kern disliked groups of trainees.  Officer Edwards Dep. Testimony, ECF No. 79-2, 61:10-16.  Officer Edwards' conclusion, however, was not based on statements made by Officer Kern or the relationship between Officer Kern and Mr. Gray.  In addition, the mere existence of an EEOC complaint – which does not indicate culpability or an EEOC finding of racist conduct – does not lead to the conclusion that Officer Kern was broadly racist towards African Americans in general or Mr. Gray in particular.

Plaintiffs' proffered evidence is not legally sufficient to allow a trier of fact to conclude that Officer Kern maliciously and willfully targeted Mr. Gray when he shot his live weapon at the door.  C.f. Hines v. French, 852 A.2d 1047, 1063 (Md. Ct. Spec. App. 2004) (finding a sufficient jury question regarding malice when plaintiff's version of facts alleged that defendant "deliberately and willfully targeted [plaintiff's] pre-existing injury and that he laughed or made other verbal statements indicating an intent to harm her").  There is, therefore, insufficient evidence from which a jury could conclude that Officer Kern acted with malice to defeat his public official immunity.

Nor will Plaintiffs' alternative argument regarding a "special relationship" between Officer Kern and Mr. Gray succeed in defeating Officer Kern's public official immunity. Plaintiffs argue that "Officer Kern's assertion that he carried his loaded service weapon that day out of an obligation to ensure the safety of himself and others during a training exercise established the existence of a special relationship with Plaintiff Gray."  ECF No. 79-1 at 22.  Officer Kern counters that "[a]lthough [he] took affirmative steps to protect the trainees, Officer Edwards, and himself by continuing to wear his live service weapon in the unsecured training facility, [he]

12

did not make any affirmative promise to Plaintiff or any of the trainees that he would protect him."  ECF No. 82 at 6.

The Court need not decide whether a "special relationship" existed between Officer Kern and Mr. Gray because the doctrine is applied only when a duty exists to control the conduct of a third person.  The question of a "special relationship" in Maryland law arises when a victim brings an action against a police officer for an injury caused by a third person. Specifically, Maryland courts, in determining whether a police officer had a duty to the injured party, apply the "general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured."  Ashburn v. Anne Arundel Cnty., 510 A.2d 1078, 1084 (Md. 1986) (citing Restatement (Second) of Torts § 315 (1965)).  The Maryland Court of Appeals in Williams v. Mayor & City Council of Baltimore surveyed case law regarding the special relationship doctrine, and specifically adopted the test as expressed in Ashburn: "[i]n order for a special relationship between police officer and victim to be found, it must be shown that the . . . police officer affirmatively acted to protect the specific victim or a group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection."

13

Williams v. Mayor & City Council of Baltimore, 753 A.2d 41, 67-68 (Md. 2000) (quoting Ashburn, 510 A.2d at 1085).  This doctrine is now commonly understood to not only define a tort duty between police officer and victim but also to act as an exception to public official immunity.  Lovelace v. Anderson, 785 A.2d 726, 735 (Md. 2001) ("Another limitation to a police officer's defense of public official immunity occurs when, under the circumstances, a special relationship exists between the officer and the injured person which creates a duty on the part of the officer to protect the victim.").

Here, the parties debate whether Officer Kern's conduct created an affirmative duty to protect Mr. Gray from harm.  That argument, however, is immaterial in the absence of a third person.  When a special relationship exists, the duty to protect another from harm is to protect another from harm by third persons.  Mr. Gray was injured directly by Officer Kern, not a third party despite an obligation by Officer Kern to Mr. Gray to protect him from that third party.  As the tort was allegedly directly committed by Officer Kern against Mr. Gray, the doctrine of "special relationship" will not apply against Officer Kern's claim of public official immunity.  Accordingly, judgment on Plaintiffs' negligence claim will be granted in favor of Officer Kern and against Plaintiffs on the grounds of immunity.

14

ii. <u>Gross Negligence</u>

Gross negligence is "something <u>more</u> than simple negligence and likely more akin to reckless conduct." <u>Taylor v. Harford Cnty. Dep't of Soc. Servs.</u>, 862 A.2d 1026, 1035 (Md. 2004). Gross negligence is defined as

> an intentional failure to perform a manifest duty
> in reckless disregard of the consequences as
> affecting the life . . . of another, and also
> implies a thoughtless disregard to the
> consequences without the exertion of any effort
> to avoid them.  Stated conversely, a wrongdoer is
> guilty of gross negligence or acts wantonly and
> willfully only when he inflicts injury
> intentionally or is so utterly indifferent to the
> rights of others that he acts as if such rights
> did not exist.

<u>Marriott Corp. v. Chesapeake & Potomac Telephone Co. of Md.</u>, 723 A.2d 454, 478 (Md. Ct. Spec. App. 1998).  In the context of a claim against a police officer, as here, "[t]he reasonableness of the conduct must be evaluated not from the perspective of a reasonable civilian, but rather from the perspective of a reasonable police officer similarly situated." <u>State v. Albrecht</u>, 649 A.2d 336, 349 (Md. 1994).  "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." <u>Artis v. Cyphers</u>, 642 A.2d 298, 308 (Md. Ct. Spec. App. 1994).

Here, the facts are not "so clear" as to support Officer Kern's position that they are insufficient to support a

conclusion that his conduct constituted gross negligence.
Officer Kern makes three fact-based arguments in support of his
position that his acts or omissions did not rise to the level of
reckless conduct: (1) that he did not knowingly point his live
weapon at Mr. Gray, distinguishing his conduct from other cases
before Maryland courts; (2) that the simunitions weapon he meant
to use is essentially harmless; and (3) that the simunitions and
live weapons were so similar that a reasonable officer would not
have been able to tell the difference between the two.  The
facts underlying these arguments, however, could equally support
a jury's conclusion that Officer Kern's conduct recklessly
disregarded the risk of serious injury and warrant a finding of
gross negligence.

Officer Kern repeats in varying language that his conduct
was not reckless and did not evince a conscious disregard for
serious risk to others because "Officer Kern, or a reasonable
officer in his position, would not think that firing a
simunitions round at a door would cause any harm, much less
death or serious injury."  ECF No. 78-1 at 9.  A finder of fact,
taking everything submitted in favor of Plaintiffs as the non-
moving party, is not required to make such a conclusion,
especially when considering that Officer Kern fired at the
window, not the door, and noting that trainees are required to
wear extra protective gear when using simunitions.  Even if a

fact-finder were to accept Officer Kern's premise that a simunitions weapon was entirely harmless, that would not preclude a conclusion that Officer Kern consciously disregarded the risk of his actions.  Given the lethal capabilities of a service weapon, a finder of fact could conclude that Officer Kern consciously disregarded the risk in keeping it in close proximity to his simunitions weapon.[7]

Officer Kern argues "[d]ue to the simunitions gun and [the] live service weapon having identical weights, feeling the same in his hand, and looking nearly identical . . . given that his hands were wrapped around the only obvious external difference . . . Officer Kern had no idea that he was firing his actual service weapon."  ECF No. 78-1 at 9.  Kern further states that "adding further credibility to the lack of gross negligence is the fact that there is very little difference between the simunitions device and the live service weapon."  Id.  He ultimately concludes that he "reasonably could not immediately tell he was holding the 'wrong weapon'" and "could not tell he had withdrawn the 'wrong' weapon until it was too late."  Id.  A finder of fact could, from the underlying facts, conclude that

---

[7] Officer Kern implicitly concedes as much elsewhere in his motion.  ECF No. 78-1 at 6 ("Officer Kern carried both his live service weapon and simunitions gun on his right side, relatively close to one another, evidencing that one could be withdrawn accidentally in place of the other.").

17

the highly similar look and feel of the two weapons supports a
finding of gross negligence considering that Officer Kern failed
to take steps to sufficiently distinguish the two, and failed to
exert any effort to avoid the consequences of a potential mix-
up.

Officer Kern places great weight in the fact that he did
not "know" he had pulled and shot his live weapon rather than
his simunitions weapon.  In particular, Officer Kern points to
Mouldin v. State, 69 A.3d 36 (Md. Ct. Spec. App. 2013), and
Albrecht – both criminal, not civil, cases – to argue that he
was not reckless because he believed he pulled his simunitions
weapon and did not know he shot his live weapon until after Mr.
Gray had been injured.  In Albrecht, a Baltimore police
officer's conviction of reckless endangerment was upheld as the
court found that the State adduced sufficient testimony that "a
reasonable Montgomery County police officer would not have acted
as Albrecht did on this occasion, in drawing and racking a
shotgun fitted with a bandolier and bringing it to bear, with
his finger on the trigger, on an unarmed individual who did not
present a threat to the officer or to any third parties, in a
situation where nearby bystanders were exposed to danger."  649
A.2d at 350-351.  Officer Kern seeks to distinguish his conduct
from Albrecht, arguing that he, contrary to defendant who knew
"the gun was capable of firing," "believed he had drawn his

simunitions gun, for all intents and purposes synonymous with a fake gun incapable of firing." ECF No. 78-1 at 20.   If the question of Officer Kern's reckless conduct was limited to his act of pointing at the window of the door and pulling the trigger, the Court could find distinction between Officer Kern's conduct and Albrecht.   The question of Officer Kern's recklessness, however, encompasses an entire day of acts and/or omissions from which a finder of fact could determine that Officer Kern acted with reckless disregard for the safety of Mr. Gray.

In Mouldin, the defendant's conviction for criminal recklessness was overturned on the ground that his act of brandishing and pointing a fake or inoperable firearm at another could not support a finding that he created a "substantial risk of death or serious physical injury to another." 69 A.3d at 52. In arriving at its decision, the Maryland Court of Special Appeals determined that "[Maryland] cases hold that the risk of death or injury created in recklessly handling a loaded, operable firearm is that the weapon may discharge." Officer Kern seeks to align himself with Mouldin because "Officer Kern's subjective belief about the gun's capabilities mirrors what the Defendant knew about the gun involved in Mouldin, that [it] was incapable of causing harm." ECF No. 78-1 at 20. At issue, though, was not Mouldin's subjective belief about the gun.

Rather, the Maryland Court of Special Appeals addressed only the absence of evidence regarding the lethal nature of the weapon used and was silent regarding Mouldin's state of mind.  69 A.3d at 52 ("Here, there is no evidence that the alleged weapon was either operable as a firearm or substantial enough to use as a bludgeoning instrument."). Mouldin is inapplicable to the case at hand.

Ultimately, Officer Kern argues that key elements of the day were out of his control, such that he was compelled to carry his weapon to ensure that all present at the Rosewood facility were safe.  Setting aside the question of whether reckless conduct equates with choosing to carry a live weapon to training in response to elements out of one's control despite violating protocol and ignoring the recommendation of a fellow officer, Officer Kern was completely in control of the elements and decisions that directly led to Mr. Gray's injury.  Officer Kern was in control of the placement of his live weapon and his simunition weapon, choosing to place both on his strong side, leaving his live weapon holstered and the simunition weapon in his pocket.  Officer Kern was in control of the decision to fire a shot in the direction of Mr. Gray even though Mr. Gray was not actively participating in training and the concept of "fatal funnels" was not being taught that day.  Officer Kern was in control of the decision to not check the handle of his chosen

weapon before firing, despite the fact that neither expediency nor emergency prevented him the opportunity to confirm he was holding his simunition weapon.  Officer Kern was in control of pointing his weapon in line with Mr. Gray's head, pulling the trigger, and firing at "an unarmed individual who did not present a threat to anyone."

From this volitional conduct and active decision making, a jury may conclude that Officer Kern's conduct was "so utterly indifferent" to the rights of Mr. Gray that he acted "as if such rights did not exist."  To conclude that Officer Kern is entitled to judgment as a matter of law would be to conclude that a "reasonable police officer similarly situated" could act no other way than Officer Kern did.  Such a conclusion is untenable in the presence of facts that permit the conclusion that Officer Kern violated well-established safety protocol, failed to take preventive measures to preserve the well-being and safety of trainees, and decided to point and shoot a weapon – real or simunition – at the head of a trainee without a proper purpose.  Officer Kern's motion for summary judgment as to gross negligence will be denied.

> **b.** Plaintiffs' Intentional Tort Claims

Officer Kern argues that, because he believed he drew his simunitions weapon to "remind the Plaintiff and the other recruits to keep out of a dangerous area that could lead to harm

in the future" he did not have the requisite intent to sustain
Plaintiffs' intentional tort claims of False Imprisonment (Count
I), Assault (Count III), and Battery (Count IV).  ECF No. 78-1
at 10.  Plaintiffs counter that there are sufficient facts from
which a jury could conclude that Officer Kern acted
intentionally and "the fact that Defendant Kern deviated from
his authorized duties in conducting a training class to engage
in a prohibited activity demonstrates that he intended the
consequences of his acts."  ECF No. 79-1 at 14.

Liability for the tort of assault will lie when the
defendant intentionally makes "an unlawful attempt to cause a
harmful or offensive contact with the person of another or to
cause an apprehension of such a contact."  Continental Cas. Co.
v. Mirabile, 449 A.2d 1176, 1183 (Md. Ct. Spec. App. 1982).  A
battery is a consummated assault.  Id.  The intent element of
assault and battery "require[] not a specific desire to bring
about a certain result, but rather a general intent to
unlawfully invade another's physical well-being through a
harmful or offensive contact or an apprehension of such
contact."  Nelson v. Carroll, 735 A.2d 1096, 1101 (Md. 1999).
The "intent element of battery may be supplied by the intent
element of the assault."  Id. at 1102.

There are sufficient facts from which a fact-finder could
conclude that Officer Kern intended to place Mr. Gray in

22

apprehension of harm or offensive contact when he fired at the door.  Officer Kern's stated reason for shooting at the door of the gymnasium was to "remind [the trainees] that . . . [a fatal funnel] is an area in which you do not need to be.  You need to learn to stay out of those areas, fatal funnels, at all times." Kern Trial Test., ECF No. 78-3, 31:10-12.  "Fatal funnels," as the name implies, is a point of acute danger for officers, where they may be ambushed and attacked, or as Mr. Kern testified "those are the biggest areas that police get killed in."  Id. 31:1-2.  A finder of fact could conclude that Mr. Kern, by firing a shot to strike the door, intended to recreate the risk and shock inherent to being in a fatal funnel and so intended to place the trainees, including Mr. Gray, in apprehension of immediate harm as though they were in a fatal funnel.  As a finder of fact could conclude that Kern intended to cause an apprehension of immediate harm, or an assault on Mr. Gray, a finder of fact could also infer intent to cause a battery despite the fact that Officer Kern contends that the harm to Mr. Gray was unintentional.  Nelson, 735 A.2d at 1102 ("Therefore, one who intends to frighten another by assaulting him . . . and touches this person in a harmful or offensive manner and claims the touching was . . . accidental, is liable for battery."). Therefore, Officer Kern's motion as to Counts III and IV of Plaintiffs' complaint will be denied.

Liability for the tort of false imprisonment will lie when there is some "direct restraint of the person . . . .  Any exercise of force, or direct threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment."  Estate of Jones v. NMS Health Care of Hyattsville, LLC, 903 F. Supp. 2d 323, 331 (D. Md. 2012) (quoting Mason v. Wrightson, 109 A.2d 128, 131 (Md. 1954)).  Accordingly, false imprisonment requires some sort of volitional conduct that continually prevents the plaintiff from moving from his or her current space.  Much of Maryland case law regarding false imprisonment is considered in conjunction with false arrest, as the tort is often brought against a police officer or the state by an arrestee.  See, e.g., Okwa v. Harper, 757 A.2d 118, 133 (Md. 2000) (considering an appeal in which a Maryland Transportation Authority officer arrested plaintiff causing a disturbance at an airport).  In these cases, the question of restraint of liberty is conceded by the presence of an arrest and the inquiry focuses on the legal justification of the officer in conducting the arrest.  See, e.g., Roschin v. State, 100 A.3d 499, 507 (Md. Ct. Spec. App. 2014) (stating that, as there was an arrest that plaintiff did not consent to, "the pertinent question before us is whether [defendant] possessed legal justification to arrest [plaintiff]").  In cases, however,

24

not involving an arrest or a detention, a hallmark of false imprisonment is a continuing action on the part of the tortfeasor that restrains the movement of the plaintiff.  <u>See Henderson v. Claire's Stores, Inc.</u>, 607 F. Supp. 725, 734 (D. Md. 2009) (denying summary judgment to defendant whose employee refused to return driver's license so plaintiff could leave the store).  Officer Kern's actions are not of that continuous kind, undertaken or calculated to prevent Mr. Gray from leaving Rosewood or leaving the hallway.  Officer Kern shot Mr. Gray, but took no further action to confine him to the Rosewood facility.  He, in fact, took steps to enable his removal from the building by notifying Officer Edwards and calling 9-1-1.  As such, judgment in favor of Officer Kern and against Plaintiffs is appropriate for the count of false imprisonment.

Liability for the tort of intentional infliction of emotional distress requires that "(1) the conduct must be intentional or reckless, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress must be severe."  <u>Ford v. Douglas</u>, 799 A.2d 448, 451 (Md. Ct. Spec. App. 2002).  This tort provides for "liability for conduct exceeding all bounds usually tolerated by decent society of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.

The requirements of the rule are rigorous and difficult to satisfy." Williams v. Prince George's Cnty., 685 A.2d 884, 889 (Md. Ct. Spec. App. 1996). Officer Kern argues that Plaintiffs have failed to establish that his conduct met the first two requirements of intentional or reckless conduct that was "extreme and outrageous." As discussed above, the Court finds that a jury could conclude that Officer Kern's conduct was intentional or reckless. The inquiry then focuses on whether his conduct was also "extreme and outrageous."

Conduct is deemed outrageous and extreme "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Harris v. Jones, 380 A.2d 611, 614 (Md. 1977). Outrageous conduct is considered "a complete denial of a plaintiff's dignity as a person." Hamilton v. Ford Motor Credit Co., 502 A.2d 1057, 1064 (Md. Ct. Spec. App. 1986).

"The extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests." Figueiredo-Torres v. Nickel, 584 A.2d 69, 75 (Md. 1991). Furthermore, "[i]n cases where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be

26

carefully scrutinized by the courts." Brengle v. Greenbelt
Homes, Inc., 804 F. Supp. 2d 447, 453 (D. Md. 2011).
Ultimately, "where reasonable jurors may differ as to whether
the defendant's conduct may be regarded as extreme and
outrageous, the question should be submitted to a jury." Id.

Here, the Court concludes that reasonable jurors may differ
as to whether Officer Kern's conduct could be regarded as
extreme and outrageous. Officer Kern was in a supervisory
position over Mr. Gray and the other trainees, and was working
in an environment in which safety and group cohesion was
paramount. See Tyndall v. Berlin Fire Co., 2015 WL 4396529, at
*36 (D. Md. July 16, 2015) (finding a genuine dispute of
material fact as to outrageous conduct where defendants were
supervisors in a fire department requiring cohesion among
workers). By violating safety rules and choosing to shoot a
weapon at unaware trainees waiting for instruction, Officer Kern
chose to inject high risk into a situation calculated to be safe
for participants. A jury could conclude that Officer Kern, in
choosing to engage in conduct that abused his position in
control of trainees, that violated established safety norms,
that was calculated, at the least, to cause fear, and that
created a risk of serious harm where there would otherwise be
none, chose a course of action that is "utterly intolerable in a

civilized community."  Accordingly, judgment in favor of Officer

Kern as to Count V of Plaintiff's Amended Complaint is denied.[8]

> **c.** <u>Plaintiffs' Claims Under State and Federal
>   Constitutions</u>

Plaintiffs bring two counts under 42 U.S.C. § 1983 (Counts

VIII and IX) along with a related Maryland constitutional claim

(Count II).  Although it is not entirely clear from their

complaint the scope of such claim, Plaintiffs accept Officer

Kern's interpretation that their claims could arise under either

the Fourth or Fourteenth Amendment.[9]  In his motion, Officer Kern

asserts that he should be granted judgment on Plaintiffs'

constitutional claims because he neither intended to seize Mr.

Gray, as prohibited by the Fourth Amendment, nor intended to

injure Mr. Gray, as prohibited by the Fourteenth.  Plaintiffs

object to both characterizations and maintain there is

sufficient evidence upon which a jury could find that Officer

---

[8] Officer Kern also moved for summary judgment as to Plaintiffs'
Count XI – Loss of Consortium.  A "loss of consortium claim is
derivative of the injured spouse's claim for personal injury."
<u>Oaks v. Connor</u>, 660 A.2d 423, 430 (Md. 1995).  As the Court has
denied Officer Kern's motion on some counts and Mr. Gray's claim
for injury survives, the Court will similarly deny Officer
Kern's motion as to Count XI.

[9] Plaintiffs bring a cause of action under Articles 24 and 26 of
the Maryland Constitution's Declaration of Rights.  These
provisions are the state analog to the federal Fourteenth and
Fourth Amendments respectively, and are analyzed <u>in pari
materia</u>.  <u>Miller v. Prince George's Cnty.</u>, 475 F.3d 621, 631 n.
5 (4th Cir. 2007).

Kern's conduct constituted a violation of Mr. Gray's Fourth or Fourteenth Amendment rights.   The Court disagrees.

Plaintiffs argue that Officer Kern's conduct constituted a seizure in violation of the Fourth Amendment, or, alternatively, the Fourteenth Amendment.   Section 1983 provides "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . ."   Section 1983, standing alone, does not provide substantive rights; rather, it is a "method for vindicating federal rights elsewhere conferred."   Baker v. McCollan, 443 U.S. 137, 141 n.3 (1979).

Generally, courts are "reluctant to expand the concept of substantive due process."   Collins v. Harker Heights, 503 U.S. 115, 125 (1992).   The Supreme Court has stated that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."   Albright v. Oliver, 510 U.S. 266, 273 (1994).   Thus, if Plaintiffs' constitutional claims are "covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard

29

appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272 n. 7 (1997).  Resort to substantive due process is inappropriate, therefore, unless Plaintiffs' claim is not "covered by" the Fourth Amendment.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 843 (1998).

Here, the evidence does not support a conclusion that Officer Kern violated the Fourth Amendment's prohibition on unreasonable seizures.  A Fourth Amendment seizure occurs where a government actor has, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968).  As the Supreme Court has noted, a "Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's movement, . . . nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement, . . . but only when there is a governmental termination of freedom of movement through means intentionally applied." Brower v. Cnty. of Inyo, 489 U.S. 593, 596-97 (1989) (emphasis in original).  To illustrate this distinction, the Brower Court contrasted a police car that slips its brake to pin an individual with a police-devised blockade succeeding in its express purpose of stopping an individual's movement.  Id.  The Court reasoned that the first instance,

although involving a governmental force resulting in a
termination of movement, did not constitute a seizure because it
lacked the intentional application of the second scenario.  The
Court finds that Officer Kern's conduct fits under the former
category, as he lacked the intention to restrict Mr. Gray's
movement to effect a seizure.  Officer Kern's stated – and
undisputed – purpose of firing a shot in Mr. Gray's direction
was to remind Mr. Gray and the surrounding trainees of the
danger of a fatal funnel.  There is no evidence that would
suggest that Officer Kern meant to restrain Mr. Gray to the
purported "fatal funnel" area.  Therefore, although Officer
Kern's actions resulted in a termination of Mr. Gray's freedom
of movement, Officer Kern's conduct does not rise to the level
of a Fourth Amendment violation as the termination was not a
result of "means intentionally applied."

    Moreover, even when viewed under the purview of substantive
due process, judgment must still be granted to Officer Kern.
The Due Process Clause of the Fourteenth Amendment "protects a
set of interests – life, liberty, and property – that are also
protected by state tort law."  Waybright v. Frederick Cnty., 528
F.3d 199, 204 (4th Cir. 2008).  It does not, however, "impose
federal duties that are analogous to those traditionally imposed
by state tort law," Collins v. City of Harker Heights, 503 U.S.
115, 128-29 (1992), nor "transform every tort committed by a

31

state actor into a constitutional violation." DeShaney v.
Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 202 (1989).

Only the "most egregious official conduct can be said to be
arbitrary in the constitutional sense" and thus run afoul of the
substantive due process clause of the Fourteenth Amendment.
Lewis, 523 U.S. at 846.  Thus, the Supreme Court requires
conduct to be "wrong enough to register on a due process scale
that 'shocks the conscience.'"  Waybright, 528 F.3d at 205.
Generally, for a due process challenge to executive action to
succeed, the "action must have been 'intended to injure in some
way unjustifiable by any government interest.'"  Id. (citation
omitted).  Negligent infliction of harm is "categorically
beneath the threshold of constitutional due process," but where
culpability falls in the middle range, i.e., "something more
than negligence but less than intentional conduct," the Supreme
Court "has allowed that it may have constitutional implications,
but only in special circumstances."  Id.

Officer Kern's conduct can be considered reckless, wanton,
thoughtless, and far below the expected conduct of an officer of
the law.  His conduct, however, fails to rise to the necessary
intent for a Fourteenth Amendment violation.  Just as Officer
Kern's stated – and again, undisputed – purpose of shooting in
the direction of Mr. Gray was to alert Mr. Gray of his presence
in a "fatal funnel" does not evince intent to seize, it also

32

does not reveal an intent to injure Mr. Gray. And unlike
assault and battery, where the intent to cause alarm can be
imputed to the intent to cause harm, Officer Kern's intent
cannot be stretched to fit the Fourteenth Amendment
requirements. Accordingly, his conduct falls in the "uncertain
middle ground" between mere negligence that never constitutes a
Fourteenth Amendment violation and intentional conduct that may.
See Patten v. Nichols, 274 F.3d 829, 834 (4th Cir. 2001) ("The
difficulty comes in determining whether the point of the
conscience shocking is reached when injuries are produced with
culpability falling within the middle range, following from
something more than negligence but less than intentional
conduct, such as reckless or gross negligence.") (citation
omitted).

     The Court, cautioned as it is to "exercise utmost care" in
considering an expansion of the applicability of the Fourteenth
Amendment, Collins, 503 U.S. at 125, does not find in precedent
a ground upon which to find an exceptional circumstance that
state tort law cannot remedy. The Fourth Circuit has repeatedly
cautioned against finding a Fourteenth Amendment violation when
an injury occurs at a state-run training event. See Slaughter
v. Mayor and City Council of Baltimore, 682 F.3d 317, 323 (4th
Cir. 2012) (citing, with approval, the caution of Waybright that
the implications of finding that government liability could flow

from its creation of a dangerous condition are "immense"). The Fourth Circuit has also rejected the most applicable exception, where an "opportunity to deliberate" upon one's actions raise a constitutional claim. See Slaughter v. Mayor and City Council of Baltimore, 757 F. Supp. 2d 548, 551 (D. Md. 2010) (stating that the Fourth Circuit has rejected the line of reasoning that "deliberate indifference is actionable if the governmental actors had an opportunity to deliberate before acting and their conduct is severe enough to shock the conscience."). Accordingly, the Court will grant summary judgment to Officer Kern on Plaintiffs' constitutional claims.

### B. Major Russell and Officer Edwards' Motion for Summary Judgment

Defendants Major Russell and Officer Edwards have moved for summary judgment on the grounds that there is no evidence showing (1) that either Defendant took an intentional action to support a claim of assault, battery, false imprisonment, or intentional infliction of emotional distress; (2) an intentional act of seizure or force to support a claim under the Constitution or Maryland Declaration of Rights; and (3) a failure to perform a manifest duty to support a claim of gross negligence. ECF No. 86-1 at 3. They also assert public official immunity against Plaintiffs' claim of negligence.

34

By choosing to focus their opposition on the conduct of Officer Kern, Plaintiffs essentially concede the point that there is no evidence of an intentional action by either Major Russell or Officer Edwards to support a finding of direct liability with regards to the intentional torts and constitutional claims.  In particular, Plaintiffs focus on Officer Edwards and Major Russell's characterization of the shooting as "accidental," despite the fact that the movants use the word "accidental" once in the opening sentence of their motion and base the substance of their arguments on their own conduct and not on the nature of Officer Kern's actions. Plaintiffs' assertion that once Officer Kern's conduct is examined, "the rest of the co-defendants Edwards and Russell's attack on the respective Counts crumbles like a house of cards," ECF No. 88, is misplaced as Plaintiffs fail to demonstrate any direct action on the part of Officer Edwards and Major Russell that contributed in any way to Officer Gray's injuries.  As such, summary judgment must be granted to Officer Edwards and Major Russell as to Counts I-V and Counts VIII-IX unless there is an alternate ground upon which to impose liability.

Plaintiffs do inconsistently assert various concepts of vicarious liability in an attempt to attach Officer Kern's

conduct to Officer Edwards and Major Russell.[10]  As to the
intentional tort and negligence claims, Plaintiffs argue that
Officer Edwards can be held liable for the tortious conduct of
Officer Kern under a theory of aider and abettor liability.  ECF
No. 88-1 at 12.  "A person may be held liable as a principal"
for a tort "if he, by any means (words, signs, or motions)
encouraged, incited, aided, or abetted the act of the direct
perpetrator of the tort."  Duke v. Feldman, 226 A.2d 345, 347
(Md. 1967).  Plaintiffs argue that Officer Edwards was an aider
and abettor because he chose a facility that Officer Kern felt
was unsafe, he pre-approved Officer Kern's decision to carry a
weapon, and he acquiesced in allowing Officer Kern to carry a
weapon even though Officer Edwards knew that Kern "had expressed
hatred towards African Americans . . . and, in the opinion of
some, Kern was unqualified to serve in the position of an
instructor."  ECF No. 88-1 at 13.  The Court finds these facts
do not constitute aiding or abetting activity sufficient to give
rise to liability.  To aid or abet the commission of a tort, an
individual must give "substantial assistance or encouragement to
the principal to engage in the tortious conduct."  Legacy Inv. &

---

[10] As the Court has granted summary judgment to Officer Kern for
Plaintiffs' constitutional claims, it need not address
Plaintiffs' argument that Major Russell could be held liable
under supervisory liability and Officer Edwards under aider and
abettor liability.

Mgmt., LLC v. Susquehanna Bank, 2014 WL 5325757, at *4 (D. Md. Oct. 17, 2014).  The tortious activity that resulted in Mr. Gray's injuries was Officer Kern pulling his weapon and firing at Mr. Gray.  The act of choosing a site for training or acquiescing to a desire to carry a putatively unloaded weapon does not constitute substantial encouragement that directly enabled Officer Kern to shoot at a trainee.  In addition, Officer Edwards was not in the vicinity of Officer Kern when he shot Mr. Gray.  See Gorby v. Weiner, 2014 4825962, at *16 (D. Md. Sept. 23, 2014) ("Although what constitutes aiding and abetting is a fact-specific question, it is limited to instances in which a defendant can be shown to have helped the principal tortfeasor bring about a particular tort.").  There is no legally sufficient evidence proffered to support liability on the part of Officer Edwards in relation to the assault, battery, and intentional infliction of emotional distress claims.

Plaintiffs do not attempt to extend aider and abettor liability to Officer Russell.  They do, however, cursorily make reference to the doctrine of respondeat superior when they state that "Defendant Russell would be liable under the supervisory liability for his seeming indifference to abuses by officers under his command."  ECF No. 88-1 at 19.  Plaintiffs offer no argument as to the standards of vicarious liability or facts meeting those standards and therefore fail to establish a ground

upon which vicarious liability could be imputed to Major
Russell.[11]

Finally, Plaintiffs argue that sufficient evidence exists
to find that both Officer Edwards and Major Russell's conduct
constitutes gross negligence.  Plaintiffs characterize Officer
Edwards' gross negligence as "permit[ting] Officer Kern to
exercise prohibited conduct, i.e., the retention of his loaded
service revolver" and Major Russell's gross negligence as
failing to exercise control over the training exercise and
failing to properly select personnel.  ECF No. 88-1 at 19.  The
facts asserted, taken in the light most favorable to Plaintiffs,
are not legally sufficient to warrant submission of the claims
of gross negligence charged against Officer Edwards and Major
Russell to a trier of fact.

The evidence shows that Officer Edwards acquiesced to
Officer Kern carrying his service weapon into training, asked
Officer Kern repeatedly to conduct a safety check of his weapon,
and may have observed Officer Kern use his weapon in
demonstration prior to shooting.  At no time, however, was

---

[11] Plaintiffs also fail to address Major Russell and Officer
Edwards' assertion of public official immunity as to negligence,
except to posit that "Defendants Edwards and Russell would share
in the same special relationship status" as Officer Kern that
established a duty to protect Mr. Gray from harm.  ECF No. 88-1
at 18.  Plaintiffs fail to support this statement with any
evidence of affirmative conduct on the part of Officer Edwards
and Major Russell to protect Mr. Gray from Officer Kern.

Officer Edwards in a position of authority or supervision to order Officer Kern to leave his weapon outside of the training area.  Nor did Officer Edwards have any indication that Officer Kern did not, in fact, conduct a weapons check in accord with Officer Edwards' inquiry.  Officer Edwards affirmatively asking Officer Kern if he was safely carrying his weapon does not evince an "utter[] indifferen[ce] to the rights of others" as if "those rights did not exist."  Liscombe v. Potomac Edison Co., 495 A.2d 838, 846 (Md. 1985).  Officer Edwards' choices with regard to Officer Kern's decision-making reflects the exercise of a discretionary power "to be exerted or withheld according to his own judgment as to what is necessary and proper."  James, 418 A.2d at 1179.  As the evidence, at best, would constitute negligence from which Officer Edwards is immune, judgment will be granted to Officer Edwards on Count VI, charging gross negligence.

Plaintiffs argue that Major Russell should be held liable for gross negligence because "although his duties clearly set forth the fact that he should have had knowledge and exercised control over the training exercise and the personnel conducting said exercise, he, by his own admission, had absolutely no personal knowledge of same," ECF No. 88-1 at 19, and cite generally to Major Russell's deposition for support.  The Court finds that Major Russell's deposition does not support

39

Plaintiffs' ground for gross negligence.  An overview of Major
Russell's position as described in his resume shows that his job
responsibilities were managerial in nature and did not involve
leading or supervising training.  See, Attach. to Russell Dep.,
ECF No. 88-12 at 13 (including duties such as "assessing
existing training programs, . . . assisting in policy
development, . . . formulating recommendations for improvement,
. . . researching methods to improve . . . process, [and]
advising department of current developments in educational
methodology").  As provided in his deposition, another of Major
Russell's duties is to "ensure that [training of recruits] is
being done by certified instructors."  Russell Dep., ECF No. 88-
12, 17:9-10.

In order to accomplish this task, Major Russell brings in
officers from different divisions in the Baltimore Police
Department to train in their area of expertise.  See Id. 17:20-
18:1 ("So, we have special officers come in to, like, teach
traffic from the traffic division; that's the expertise they're
qualified to train.").  Officers Kern and Edwards were
"certified trained in firearms and certified trained in
providing simunitions training."  Id. 35:6-8.  Individual
officers and divisions are responsible for seeking out relevant
specialized training.  Major Russell would normally be aware of
the training conducted on any given day through a weekly

calendar he printed.  Major Russell, however, was not aware of
the training conducted on the day in question, since he himself
was out of the office for the week to receive training.  <u>Id.</u>
26:14-27:1 ("I was being trained [at the] International
Association of Chiefs of Police, IACP, Training for Leadership .
. . I was going to be gone for a whole week.").  To provide
cover for his absence, he put two lieutenants in charge during
the week.  There is no indication that an absence of a week for
training or placing lieutenants in charge was in violation of
any rule or regulation of BPD.

The Court concludes from the facts asserted that Major
Russell's duties included coordinating training, but did not
include exercising control over the training.  The facts further
disclose that, while Major Russell's duties included knowledge
of the training that was being conducted on a given day, his
delegation of oversight on the day in question, in the absence
of evidence to the contrary, is not legally sufficient to
support a finding of gross negligence. Summary judgment will be
granted in Major Russell's favor.

## IV. CONCLUSION

For the above-stated reasons, the Court will grant in part
and deny in part Officer Kern's Motion for Summary Judgment, and
will grant Major Edwards and Officer Russell's Motion for
Summary Judgment.

41

It appears that, with the resolution of the above motions, Plaintiffs' remaining claims against Officer Kern are ready to proceed to trial.  Accordingly, counsel for Plaintiffs and Officer Kern shall contact chambers to arrange a date in the spring for trial.

A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge


DATED: August 21, 2015.